# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

---

SHAWN WOODWARD,

                     Plaintiff,

     v.

LYTLE, Correctional Officer, Cape
Vincent Correctional Facility, *et al.*,

                     Defendants.

Civil Action No.
9:16-CV-1174 (NAM/DEP)

---

APPEARANCES:

FOR PLAINTIFF:

SHAWN WOODWARD, *Pro Se*
00-A-6563
Livingston Correctional Facility
P.O. Box 91
Sonyea, NY 14556

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

OF COUNSEL:

HELENA LYNCH, ESQ.
Assistant Attorney General

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Shawn Woodward, a New York State prison inmate, has commenced this civil rights action against seven individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983. Plaintiff's complaint generally alleges that defendants retaliated against him for assisting other inmates prepare grievances by issuing him false misbehavior reports and assaulting him.

Currently pending before the court is defendants' motion to dismiss plaintiff's remaining causes of action for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the motion be denied, except as it relates to three of plaintiff's retaliation claims asserted against two of the named defendants.

I.      BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. While he is now incarcerated elsewhere, at the times relevant to his claims in this action, plaintiff was confined in the Cape Vincent Correctional Facility ("Cape Vincent"), located in Cape Vincent, New York. *Id.*

Plaintiff arrived at Cape Vincent on or about April 3, 2015. Dkt. No. 1 at 3. In or about April 2015, he began working in the Cape Vincent law library. *Id.* at 3. While working in the law library, plaintiff assisted inmates in preparing legal memoranda, including a letter of complaint concerning defendant Dawley,[2] a corrections officer, for an inmate who plaintiff has

---

[1]      In light of the procedural posture of the case, the following recitation of facts has been drawn principally from plaintiff's complaint, Dkt, No. 1, as well as the materials submitted by plaintiff in opposition to the defendants' motion, Dkt. No. 28, to the extent they are consistent with the allegations set forth in his complaint. *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). Portions of the background have also been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *accord*, *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). The contents of those documents considered have been accepted as true for purposes of the pending motion. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[2]      Plaintiff identified this defendant as "Darley" in his complaint. Dkt. No. 1 at 2. Defendants, however, have referred to this individual as "Sean Dawley" in their memorandum of law in support of the pending motion. Dkt. No. 22-1 at 7. In light of defendants' motion papers, the clerk of the court is respectfully directed to modify the court's docket to reflect to correct spelling of this individual's last name.

identified as "[i]nmate D-2-39B."[3] *Id.* at 3.

In late April or early May 2015, inmate D-2-39B was transferred to a different housing block. Dkt. No. 1 at 3. According to plaintiff, "[a]fter [i]nmate D-2-39B left, Defendant Lytle – who was [the corrections officer on duty in plaintiff's dormitory early] that day – came to Plaintiff and told Plaintiff he could not be in his dorm (D-2) and think he would be writing up stuff on staff and no one would say anything and that [plaintiff's] job in the Law Lib wouldn't last long either." *Id.* at 3-4. On the same date, defendant Dawley worked as the D-2 dormitory officer later in the day and asked plaintiff if he assisted inmate D-2-39B in writing "any letters about him[.]" *Id.* at 4. When plaintiff said no, defendant Dawley recommended to plaintiff that he assault inmate D-2-39B because "saying that Plaintiff wrote them letters could get Plaintiff 'fucked-up' real bad especially when those letters are about defendant [Dawley]." *Id.*

At the end of May 2015, plaintiff agreed to be a witness on behalf of inmate Jose Colon during a disciplinary hearing related to a misbehavior report issued to inmate Colon by defendant Docteur, a corrections officer. Dkt. No. 1 at 4. On May 31, 2015, defendant Docteur asked plaintiff to tell

---

[3]    "D-2-39B" refers to the dormitory in which the inmate was housed as of April 3, 2015. Dkt. No. 1 at 3. Upon entering Cape Vincent, plaintiff was housed in "D-2-40 Top." *Id.*

4

him what he planned to testify about at inmate Colon's disciplinary hearing. *Id.* at 5. Plaintiff answered that he intended to testify that defendant Docteur lied in the misbehavior report he authored with respect to inmate Colon. *Id.* Defendant Docteur allegedly responded, "'We[']ll see how good I lie on your [misbehavior report].'" *Id.* The following day, on June 1, 2015, defendant Docteur issued plaintiff a false misbehavior report accusing him of smoking in the bathroom. *Id.* Although plaintiff was never actually called as a witness at inmate Colon's disciplinary hearing, plaintiff told defendant Jones, a corrections lieutenant who presided as the hearing officer, that defendant Docteur was retaliating against plaintiff for acting as a witness. *Id.*

After plaintiff returned to his dormitory following his interaction with defendant Jones, defendant Lytle reminded him that both he and defendant Dawley had previously warned him about the consequences of advocating on behalf of other inmates, and then instructed plaintiff not to attend his law library program "[u]ntil told otherwise[.]" Dkt. No. 1 at 5-6. Three hours later, plaintiff was directed to undergo a urinalysis test. *Id.* at 6. As plaintiff was leaving the test, defendant Lytle told plaintiff "to get all the outside rec[reation] now because it would be a long time before Plaintiff went outside." *Id.*

In the morning of June 3, 2015, defendant Gaffney, a corrections officer, "told Plaintiff that he was on his way to the box" because plaintiff had been issued "the smoking [misbehavior report], lost his job in the Law Lib, [and] got the drug use [misbehavior] report." Dkt. No. 1 at 6-7. Defendant Gaffney also told plaintiff that "he and Defendant Lytle spoke and they agreed that Plaintiff could not work in the Law Library." *Id.* at 7. Plaintiff asked defendant Gaffney what he meant by the "drug use" misbehavior report, and defendant Gaffney "stated what did Plaintiff think was going to happen when Plaintiff gave the urine?" *Id.* at 6-7. Defendant Gaffney then remarked that plaintiff had been warned to "mind his business more than once." *Id.* at 8. Two hours later, plaintiff received several documents related to his removal from the law library, as well as a misbehavior report accusing him of drug use.[4] *Id.* At that same time, defendant Gaffney repeated the threat to transfer plaintiff to a different dormitory because plaintiff had "pissed off too many staff." *Id.* Plaintiff was transferred to a different dormitory "[a] few days later," at which time defendant Gaffney threatened plaintiff with the issuance of a "sex charge"

---

[4]     The misbehavior report concerning drug use was issued by defendant Anderson, a corrections officer. Dkt. No. 1 at 9, 12. Defendant Anderson later told plaintiff that he did not know whether plaintiff actually tested positive for drug use and that he "really [did not] care" because "what he did care about was the fact that Plaintiff don't know how to mind his business, do his own time, and don't worry about writing anything up against staff." *Id.* at 12.

6

misbehavior report if plaintiff continued to "writ[e] up staff shit." *Id.* at 8.

On June 11, 2015, defendant Jones held a disciplinary hearing regarding the two misbehavior reports issued to plaintiff accusing him of smoking in the bathroom and drug use. Dkt. No. 1 at 8. Defendant Jones informed plaintiff that his "best choice" would be to plead guilty and "lay off writing up staff and being a witness at other inmates' hearing[s]." *Id.* As it was presented to plaintiff by defendant Jones, the alternative was that plaintiff would go to the "box"[5] and might not receive his personal property. *Id.* Although plaintiff attempted to explain that the misbehavior reports and job removal were in retaliation for his protected conduct, defendant Jones threatened to sanction plaintiff to the SHU if he said "one more word about that retaliation bullshit[.]" *Id.* at 9. Plaintiff thereafter pleaded guilty to both of the misbehavior reports and was sentenced by defendant Jones to ninety days of lost recreation and privileges, as well as a recommended loss of ninety days of good-time credits. *Id.* Four hours later, plaintiff's work assignment to the law library was withdrawn by the facility's program committee. *Id.*; *see also* Dkt. No. 1-3 at 1.

In late June 2015, plaintiff wrote a draft grievance against defendant

---

[5]     The court understands this to be a reference to Cape Vincent's special housing unit ("SHU").

Dawley on behalf of another inmate, who plaintiff identifies as "Tai." Dkt. No. 1 at 10. The grievance included information regarding Inmate D-2-39B to demonstrate that defendant Dawley "had a history of misconduct." *Id.* "Shortly after this," defendant Dawley arrived at plaintiff's dormitory and directed plaintiff "to go outside for a patfrisk." *Id.* Defendant Dawley asked plaintiff whether he assisted inmate Tai in writing a grievance, and when plaintiff denied doing so, defendant Dawley called him a liar and began choking him. *Id.* at 11. "On several occasions after this" defendant Dawley appeared in plaintiff's dormitory and told other inmates that plaintiff "was a 'snitch' and a 'rapo,'" and told "known gang members that if someone 'fucked-up' plaintiff[,] that defendant Dawley would guaranty [sic] that no staff member sees it and no one goes to the [SHU]." *Id.*

On July 3, 2015, plaintiff was punched in the face by a fellow inmate while in the bathroom after being asked by the inmate about "what Defendant [Dawley] was saying[.]" Dkt. No. 1 at 12. Although plaintiff and the inmate were both taken to the SHU and charged with fighting, plaintiff was also charged with drug use. *Id.* at 13. Plaintiff was found guilty of both charges, while the other inmate was found not-guilty. *Id.* Although the findings were eventually reversed, plaintiff spent nearly two months in the SHU as a result of the charge. *Id.*

In late July 2015, the Cape Vincent chaplain informed plaintiff that he was entitled to receive a cold alternative diet ("CAD") because he is a Muslim. Dkt. No. 1 at 13. Although plaintiff filed the necessary paperwork, on August 1, 2015, defendant Kenyon, who plaintiff has identified as a civilian cook at Cape Vincent, told plaintiff that he would not receive the CAD in light of a grievance plaintiff had filed concerning the mess hall staff's failure to comply with a prison directive. *Id.* at 14-15. Plaintiff then informed defendant Kenyon that he intended to file a grievance against him for retaliation, and defendant Kenyon responded by saying, "'I'll show you how to write.'" *Id.* at 15. The next day, plaintiff was issued a false misbehavior report accusing him of violating several prison rules. Dkt. No. 1 at 15.

II.     PROCEDURAL HISTORY

Plaintiff commenced this action on or about September 28, 2016, by the filing of a complaint and accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's complaint asserts First Amendment retaliation claims against all of the named defendants, as well as an Eighth Amendment excessive force claim against defendant Dawley and a Fourteenth Amendment due process claim against defendant Jones. Dkt. No. 1 at 16-18.

Upon review of plaintiff's complaint and IFP application pursuant to 28 U.S.C. §§ 1915(e), 1915A, Senior District Judge Norman A. Mordue issued a decision and order on October 19, 2016, granting plaintiff's IFP application and dismissing plaintiff's Fourteenth Amendment due process claim. Dkt. No. 4 at 14. The remaining causes of action asserted against defendants Lytle, Dawley, Docteur, Anderson, Gaffney, Jones, and Kenyon survived the court's initial review.

On January 31, 2017, the remaining defendants moved to dismiss plaintiff's retaliation and excessive force causes of action asserted against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. Dkt. No. 22. Plaintiff has opposed the motion, Dkt. No. 28, which is now fully briefed and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.  DISCUSSION

A.  Legal Standard Governing Motions to Dismiss

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though

unexacting, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.    Plaintiff's First Amendment Retaliation Claims

When prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a cognizable section 1983 retaliation claim lies. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the plaintiff's conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in

other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).[6]

Plaintiff asserts First Amendment retaliation claims against defendants Lytle, Gaffney, Dawley, Docteur, Anderson, Jones, and Kenyon arising from allegations that each defendant retaliated against him for exercising his right to free speech by preparing prison grievances and/or agreeing to be a witness on behalf of another inmate. Dkt. No. 1 at 3-18. Defendants seek dismissal of all retaliation claims asserted against them. Dkt. No. 22-1 at 15-28. I will address defendants' motion as it relates to each defendant separately below.

1. Defendant Lytle

Plaintiff asserts a First Amendment retaliation claim against defendant Lytle based on allegations that the officer removed him from his job in the law library, transferred him to another dormitory, and

---

[6]     All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

"conspire[ed] to have a false [misbehavior report] issued against [him]," all in retaliation for preparing grievances against prison officials and agreeing to be a witness at an inmate's disciplinary hearing. Dkt. No. 1 at 3-9, 16-17. Defendants maintain that this claim fails to state a plausible cause of action because the complaint fails to allege both adverse action and a causal relationship between any protected speech and the alleged retaliation. Dkt. No. 22-1 at 23-26.

It is well-settled that courts in the Second Circuit view the filing of a prison grievance as a constitutionally protected activity. *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). No distinction is drawn when one inmate files a grievance on behalf of another inmate. *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). In addition, the Second Circuit has held that voluntarily appearing as a witness in a proceeding is a form of protected speech under the First Amendment. *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995); *Piesco v. City of N.Y.*, 933 F.2d 1149, 1158 (2d Cir. 1991). It remains unclear whether this protection extends to inmates in the prison context when they offer testimony during disciplinary hearings on behalf of other inmates. *See Holmes v. LeClair*, No. 09-CV-0437, 2012 WL 5880360, at *10 (N.D.N.Y. Oct. 11, 2012) (Baxter, M.J.), *report and recommendation adopted by* 2012 WL 5880690 (N.D.N.Y. Nov.

21, 2012) (McAvoy, J.) ("[I]t was unclear in 2008, and is still unclear, whether testifying on behalf of another inmate would be protected conduct." (citing *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 340 (W.D.N.Y. 2008)). Because the parties in this case do not dispute that plaintiff has alleged his engagement in constitutionally protected conduct with respect to plaintiff's claims asserted against defendant Lytle I have assumed, for purposes of this report, that plaintiff has satisfied the first element of the retaliation test.

To satisfy the second element, plaintiff's complaint must allege facts plausibly suggesting that plaintiff suffered an adverse action. In the prison context, courts in the Second Circuit consider an "adverse action" to be one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis*, 320 F.3d at 353 (quotation marks omitted). Plaintiff alleges that defendant Lytle retaliated against him in three ways: (1) he removed plaintiff from his position at the law library, (2) he transferred plaintiff to a different housing dormitory, and (3) he conspired to issue plaintiff a false misbehavior report on June 3, 2015. Dkt. No. 1 at 16. The Second Circuit has determined that each of these acts may constitute adverse action for purposes of a First Amendment retaliation claim. *See Gill v. Pidlypchak*, 389 F.3d 379, 384

(2d Cir. 2004) ("[The plaintiff] has sufficiently alleged . . . adverse action on the part of the defendants – the filing of false misbehavior reports against [him]."); *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) ("[P]rison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[.]"); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) ("Of course, a claim for relief may be stated under section 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights.").

Thus, the court is left to consider whether plaintiff's complaint sufficiently pleads facts demonstrating the existence of a causal connection between his protected conduct and the adverse action as alleged against defendant Lytle. Plaintiff's complaint alleges that, in late April or early May 2015, defendant Lytle warned plaintiff that he could not write grievances against staff and think that his law library job would "last long." Dkt. No. 1 at 4. In addition, on or about June 2, 2015, defendant Lytle warned plaintiff about writing complaints for other inmates, and then told him not to go back to his job in the law library until he was told otherwise. Dkt. No. 1 at 6. These allegations, when considered in the light most favorable to plaintiff, are sufficient to permit the inference that defendant Lytle removed plaintiff from his law library job with retaliatory

animus. Accordingly, I recommend that defendants' motion to dismiss be denied to the extent it seeks dismissal of plaintiff's retaliation claim asserted against defendant Lytle concerning the removal of plaintiff from his law library job.

Turning to plaintiff's allegations regarding the false misbehavior report, plaintiff alleges that he was called to be a witness on behalf of inmate Colon on June 2, 2015, and, just hours later, he was directed to submit to a drug test. Dkt. No. 1 at 5-6. The drug test resulted in plaintiff being issued a misbehavior report on June 3, 2015, *id.* at 6-7, but there are no allegations in the complaint that plausibly suggest defendant Lytle was in any way involved in the issuance of the misbehavior report. Indeed, defendant Anderson, and not defendant Lytle, is alleged to have authored that misbehavior report. *Id.* at 9, 12. Even liberally construed, there are no allegations in the complaint plausibly suggesting that defendant Lytle issued plaintiff the misbehavior report as a result of any of plaintiff's protected conduct. Accordingly, I recommend that defendants' motion be granted with respect to plaintiff's retaliation claim asserted against defendant Lytle concerning the issuance of the misbehavior report on June 3, 2015.

Lastly, with respect to plaintiff's allegations that defendant Lytle

retaliated against him by transferring him to a different dormitory, there are no allegations in the complaint that support plaintiff's conclusory allegation that defendant Lytle was involved in the transfer. Dkt. No. 1 at 16. Instead, according to plaintiff, on June 3, 2015, defendant Gaffney threatened to transfer to plaintiff because had "pissed off too many staff," and that "[a] few days later," he was transferred. *Id.* at 7-8. None of these allegations involve defendant Lytle. Accordingly, I also recommend that defendants' motion to dismiss be granted with respect to plaintiff's retaliation claim asserted against defendant Lytle concerning the dormitory transfer.

### 2. Defendant Gaffney

Except as it concerns the causation element, plaintiff's retaliation claims asserted against defendant Gaffney generally arise from the same allegations as those supporting plaintiff's retaliation claims against defendant Lytle. More specifically, plaintiff's claims asserted against defendant Gaffney stem from allegations that the officer removed him from his job in the law library, transferred him to another dormitory, and "conspire[ed] to have a false [misbehavior report] issued against [him]," all in retaliation for preparing grievances against prison officials and agreeing to be a witness at an inmate's disciplinary hearing. Dkt. No. 1 at 3-9, 16-17. As was discussed above with respect to defendant Lytle, plaintiff's

complaint plausibly alleges sufficient facts to satisfy the first and second elements of his retaliation claims. Accordingly, I have focused on the third element to determine whether the complaint plausibly suggests a causal connection between plaintiff's protected conduct and the adverse action as alleged against defendant Gaffney.

Plaintiff's complaint alleges that defendant Gaffney told him on June 3, 2015, that he and "Defendant Lytle spoke and they agreed that Plaintiff could not work in the [law library] and be writing stuff up on the staff and testifying at hearings against staff." Dkt. No. 1 at 7. This occurred at the same time that defendant Gaffney presented plaintiff with the misbehavior report accusing him of drug use and "several documents related to Plaintiff's removal from the law lib." *Id.* Mindful of my obligation to liberally construe *pro se* litigants' pleadings, I find these allegations plausibly suggest that defendant Gaffney removed plaintiff from his law library job in retaliation for plaintiff's protected conduct. Because the complaint clearly alleges that the misbehavior report, which plaintiff alleges was false, was authored by defendant Anderson, Dkt. No. 1 at 9, 12, however, plaintiff's allegation that defendant Gaffney retaliated against him by issuing that misbehavior report is not supported by the allegations in the complaint. Accordingly, while I recommend that plaintiff's retaliation claim asserted

against defendant Gaffney concerning the removal of plaintiff from his law library job survive defendants' motion, I recommend that the claim asserted against defendant Gaffney concerning the false misbehavior report be dismissed.

Turning to plaintiff's allegation that defendant Gaffney transferred plaintiff in retaliation for exercising his First Amendment rights, plaintiff's complaint specifically alleges that defendant Gaffney told him that he "probably will get moved out of D-2." Dkt. No. 1 at 6. Additionally, plaintiff contends that defendant Gaffney told him that "the dorm move was because plaintiff pissed off too many staff." *Id.* at 7.  Plaintiff further alleges that, a few days after defendant Gaffney told plaintiff that he was being transferred because he was angering staff members, plaintiff was moved from the D-2 dormitory to the D-1 dormitory. *Id.* at 8. Assuming all of these allegations are true, they support a plausible inference that defendant Gaffney arranged for the transfer of plaintiff to a different dormitory in retaliation for plaintiff's protected conduct. Accordingly, I recommend that defendants' motion to dismiss be denied with respect to plaintiff's retaliation claims asserted against defendant Gaffney concerning the dormitory transfer.

### 3.   Defendant Dawley

Plaintiff's retaliation claim against defendant Dawley arises from allegations that, in retaliation for plaintiff helping other inmates prepare grievances against him, Dawley (1) incited other inmates to harm plaintiff and (2) assaulted plaintiff on June 2, 2015. Dkt. No. 1 at 16. As was discussed above, the Second Circuit has held that an inmate has a constitutionally protected right to file a grievance on behalf of another inmate. *Dolan*, 794 F.3d at 294. In addition, it is not disputed that allegations that a defendant assaulted a plaintiff in retaliation for the exercise of a constitutionally protected right satisfies the adverse-action prong of a retaliation claim. *See, e.g., Brooks v. Jackson*, No. 11-CV-6627, 2013 WL 5339151, at *7 (S.D.N.Y. Sept. 23, 2013). As for whether defendant Dawley's statements to other inmates constitute adverse action – which included accusing plaintiff of being a "'snitch'" and informing inmates they could assault plaintiff with impunity – courts within the Second Circuit have held that the incitement of harm, on its own, does not satisfy the second prong of a retaliation claim. *See Abascal v. Fleckenstein*, No. 06-CV-0349, 2008 WL 3286353, at *8 (W.D.N.Y. Aug. 7, 2008) (finding that the defendant's verbal threats, without any further action or injury, does not constitute adverse action); *Williams v. Muller*, No.

98-CV-5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) ("Although plaintiff claims the rumors [the defendant spread about him] were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if [the defendant] did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim."). In this case, however, plaintiff also alleges that he was assaulted in the bathroom on July 3, 2015, by an inmate after being asked by the inmate about defendant Dawley's comments. Dkt. No. 1 at 12. Accordingly, given the nature of the allegations in plaintiff's complaint, I find that defendant Dawley's provocative statements to the other inmates constitute adverse action.

Turning now to the third element of the retaliation claim, I find there are sufficient facts alleged to plausibly suggest that defendant Dawley assaulted plaintiff and incited other inmates to harm him out of retaliatory animus for plaintiff's participation in assisting other inmates to file grievances against defendant Dawley. Plaintiff's complaint alleges that in late April or early May 2015, defendant Dawley confronted plaintiff about the grievance he assisted inmate D-2-39B in writing against him and implicitly threatened plaintiff with harm if it was discovered that plaintiff had helped inmate D-2-39B. Dkt. No. 1 at 4. Later, in late June 2015, plaintiff

wrote a draft grievance on behalf inmate Tai, also involving complaints against defendant Dawley. *Id.* at 10. The grievance included references to the complaints Inmate D-2-39B had aired against defendant Dawley a month or two earlier. *Id.* Plaintiff alleges that "[s]hortly after this," defendant Dawley assaulted him. *Id.* Thereafter, defendant Dawley appeared in plaintiff's dormitory "[o]n several occasions" to tell other inmates that plaintiff "was a 'snitch' and a 'rapo,'" and advised other inmates they could harm plaintiff without consequences. *Id.*

While the allegations cited above do not provide specific dates for each of the interactions between plaintiff and defendant Dawley, when read together and considered in the light most favorable to plaintiff, they plausibly allege that defendant Dawley's conduct was in retaliation for plaintiff assisting other inmates in filing grievances against him. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's retaliation claims asserted against defendant Dawley.

> 4.    Defendant Docteur

Plaintiff's complaint asserts a First Amendment retaliation claim against defendant Docteur arising from allegations that defendant Docteur authored a false misbehavior report against him on June 1, 2015, in

retaliation for plaintiff agreeing and appearing to serve as a witness at inmate Colon's disciplinary hearing on June 2, 2015. Dkt. No. 1 at 5; *see also* Dkt. No. 28 at 7. More specifically, plaintiff contends that after he agreed to be a witness for inmate Colon, defendant Docteur questioned him about his anticipated testimony. Dkt. No. 1 at 4-5. When plaintiff replied that he intended to testify that defendant Docteur lied on inmate Colon's misbehavior report, defendant Doctuer said, "'We[']ll see how good I lie on your [misbehavior report]." *Id.* at 5. The next day, on June 1, 2015, plaintiff was issued a false misbehavior report by defendant Docteur accusing him of smoking in the bathroom. *Id.* at 5; Dkt. No. 28 at 7.

Defendants seek dismissal of plaintiff's claim against defendant Docteur because plaintiff did not actually testify for inmate Colon and, according to them, plaintiff therefore did not engage in constitutionally protected conduct. Dkt. No. 22-1 at 17. Defendants contend that, at best, plaintiff's complaint asserts an "anticipatory retaliation" claim that "is not actionable under the First Amendment." *Id.* Anticipatory retaliation, however, is the threat of retaliation by a defendant, and, accordingly, is not relevant in this context. *See, e.g., Beckel v. Wal-Mart Associates, Inc.*, 301 F.3d 621, 624 (7th Cir. 2002) (finding that, had the defendant threatened to fire the plaintiff, such an allegation would give rise to an anticipatory

retaliation cause of action). In this case, plaintiff does not allege any *fear* of retaliation; instead, he alleges that defendant Doctuer *actually* retaliated against him on June 1, 2015, by serving him with a false misbehavior report. Dkt. No. 1 at 4; Dkt. No. 28 at 7.

As was noted earlier in part III.B.1. of this report, although the Second Circuit has held that voluntarily appearing as a witness in a proceeding is a form of protected speech under the First Amendment, *Kaluczky*, 57 F.3d at 210, it remains unclear whether this protection extends to inmates when they offer testimony on behalf of another inmate during a prison disciplinary hearing. *Holmes*, 2012 WL 5880360, at *10; *see also Pettus v. McGinnis*, 533 F. Supp. 337, 340 (W.D.N.Y. 2008). Since the issuance of *Holmes* and *Pettus*, however, the Second Circuit has determined that prison inmates who file grievances on behalf of other inmates have engaged in protected conduct. *Dolan*, 794 F.3d at 294. *Dolan* involved a plaintiff who served on the prison's "prisoner grievance body," which is similar to the role that plaintiff in this case played as a law library employee. *Id.*; *see* Dkt. No. 1 at 3 (plaintiff describing his duties in the law library to included "prepar[ing] several constitutional[ly] protected proceeding[s] for different inmates"). Accordingly, in light of *Dolan*, I conclude that inmates who testify on behalf of other inmates at prison

disciplinary proceedings also engage in constitutionally protected conduct. For this reason, I find that plaintiff's complaint satisfies the first element of a retaliation cause of action.

Turning to the second element, as was discussed earlier, the filing of a false misbehavior report may constitute adverse action for retaliation purposes. *Gill*, 389 F.3d at 384.

Plaintiff's complaint also plausibly alleges facts supporting the causation element, as well. When defendant Docteur inquired of plaintiff regarding what he planned to testify about at another inmate's disciplinary hearing, plaintiff answered by saying that he would testify that defendant Docteur lied in the inmate's misbehavior report. Dkt. No. 1 at 5. Defendant Docteur then responded, "'We[']ll see how good I lie on your [misbehavior report].'" *Id.* The next day, plaintiff received the allegedly false misbehavior report from defendant Docteur, accusing him of smoking in the bathroom. *Id.* These allegations are sufficient to give rise to a plausible inference of retaliatory animus. Accordingly, I recommend that defendants' motion to dismiss be denied with respect to plaintiff's retaliation claim asserted against defendant Docteur.

### 5. Defendant Anderson

Plaintiff's complaint asserts a First Amendment retaliation claim against defendant Anderson arising from allegations that defendant Anderson issued him a false misbehavior report on June 2, 2015, in retaliation for plaintiff aiding other inmates in filing grievances against corrections staff.[7] Dkt. No. 1 at 17. Defendants contend that plaintiff's allegations are conclusory and that he fails to plead a causal connection between helping other inmates file grievances and defendant Anderson's issuing of an allegedly false misbehavior report. Dkt. No. 22-1 at 18-20.

As has already been discussed at length, plaintiff's complaint suffices to meet the first two elements of his retaliation claim. More specifically, the complaint alleges plaintiff engaged in the constitutionally protected conduct of filing prison grievances, and alleges adverse action based on the issuance of allegedly false misbehavior reports by defendant Anderson. *See, e.g., Gill*, 389 F.3d at 384.

---

[7] Plaintiff's complaint also alleges that defendant Anderson retaliated against him by issuing him a second false misbehavior report that was the subject of the disciplinary hearing on July 27, 2015. Dkt. No. 1 at 17-18. Because there are no other allegations in the complaint that support this claim, I recommend it be dismissed. Indeed, the complaint alleges that the misbehavior report that was at issue during the disciplinary hearing on July 27, 2015, stemmed from a physical altercation between plaintiff and another inmate in a bathroom on or about July 3, 2015. *Id.* at 12-13. There are no allegations in the complaint that defendant Anderson authored or was otherwise responsible for issuing that misbehavior report.

With respect the third element, plaintiff's complaint easily satisfies the causal connection between plaintiff assisting other inmates to file grievances and defendant Anderson's allegedly false misbehavior report. According to plaintiff, defendant Anderson told plaintiff that, as it concerns the misbehavior report issued on June 2, 2015, which accused plaintiff of drug use, he neither knew nor cared whether plaintiff actually tested positive for drug use because "[w]hat he did care about was the fact that Plaintiff don't know how to mind his business, do his own time and don't worry about writing anything up against staff." Dkt. No. 1 at 12. Assuming this allegation to be true, it plausibly suggests that defendant Anderson issued plaintiff the June 2, 2015 misbehavior report in retaliation for plaintiff assisting other inmates in filing grievances against corrections staff. Accordingly, I recommend that defendants' motion be denied with respect to plaintiff's retaliation claim asserted against defendant Anderson as it concerns the June 2, 2015 misbehavior report.

6.    Defendant Jones

Plaintiff's retaliation claim asserted against defendant Jones stems from allegations that Jones denied plaintiff his right to "respond to the charges, call witnesses, [and] present evidence" at plaintiff's disciplinary hearing on June 11, 2015, in retaliation for plaintiff assisting other inmates

to file grievances. Dkt. No. 1 at 18. Defendants argue that plaintiff's allegations against Jones are conclusory and do not support the third element of a retaliation claim. Dkt. No. 22-1 at 26.

Plaintiff's complaint satisfies the first element of a retaliation claim. *Dolan*, 794 F.3d at 294. As for the second element, which requires a defendant to have taken some adverse action against the plaintiff, defendants in this case do not contend that plaintiff's complaint fails to satisfy this component. Dkt. No. 22-1 at 26-27. For that reason, and because I have found no authority to the contrary, I have assumed that denying an inmate's requests to call witnesses and present evidence at a disciplinary hearing may constitute adverse action for purposes of a First Amendment retaliation claim.

Plaintiff's complaint also plausibly alleges sufficient facts to give rise to an inference at this early stage that defendant Jones denied plaintiff's right to present a defense at his disciplinary hearing because of plaintiff's protected conduct. Plaintiff specifically alleges that defendant Jones advised plaintiff at the hearing to stop "writing up staff and being a witness at other inmates' hearing[s]." Dkt. No. 1 at 8. Assuming it is also true that, at the same disciplinary hearing, defendant Jones denied plaintiff's request to call witnesses and present evidence, the allegations support an

inference that defendant Jones denied plaintiff's requests based upon retaliatory animus. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's retaliation claim asserted against defendant Jones.

7.    <u>Defendant Kenyon</u>

Plaintiff asserts a First Amendment retaliation claim against defendant Kenyon based on allegations that he retaliated against plaintiff for writing a grievance complaining about mess hall staff by issuing him a false misbehavior report. Dkt. No. 1 at 18. Defendants contend that plaintiff's complaint fails to allege a causal relationship between plaintiff's prior mess hall complaints and the allegedly false misbehavior report issued on August 2, 2015. Dkt. No. 22-1 at 21-22.

Plaintiff's complaint satisfies the first and second elements of the retaliation claim, *see, e.g., Gill*, 389 F.3d at 384, and defendants do not argue otherwise. As for the causation element, it is alleged that on August 1, 2015, defendant Kenyon arrived at plaintiff's cell and asked him whether he filed a grievance concerning the mess hall staff. Dkt. No. 1 at 14. When plaintiff said yes, defendant Kenyon "became disrespectful," complained that he had to respond to the grievance, and told plaintiff he was no longer going to receive the CAD, a specific diet for which plaintiff had already

been approved by prison staff. *Id.* at 15. Plaintiff then threatened to file a grievance against defendant Kenyon for retaliation, and defendant Kenyon responded by saying, "'I'll show you how to write.'" *Id.* The next day, plaintiff received a misbehavior report accusing him of violating several prison rules. *Id.* Although plaintiff does not expressly allege that defendant Kenyon authored that misbehavior report, in light of the context of plaintiff's entire complaint, the temporal proximity between defendant Kenyon's threat at plaintiff's cell and the issuance of the misbehavior report, and drawing all inferences in plaintiff's favor, I find that the complaint alleges sufficient facts to plausibly suggest that defendant Kenyon issued plaintiff the misbehavior report with retaliatory animus.[8] Accordingly, I recommend that defendants' motion to dismiss plaintiff's retaliation claim asserted against defendant Kenyon be denied.

C.     Plaintiff's Eighth Amendment Excessive Force Claim

Plaintiff's excessive force claim, which is asserted only as against defendant Dawley, is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the

---

[8]     In his opposition to defendants' motion, plaintiff appears to allege that the misbehavior report was issued by defendant Kenyon. Dkt. No. 28 at 13.

unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components, one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson*, 503 U.S. at 7-8; *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good

faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases B not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . .

focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; see also Wright, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (*quoting Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38.  In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

Plaintiff in this case contends that he prepared a draft of a grievance

for an inmate complaining of defendant Dawley's conduct and referenced defendant Dawley's past conduct as a means of showing that the officer had a history of misconduct. Dkt. No. 1 at 10. "[S]hortly after" completing the draft, defendant Dawley approached plaintiff and told him to go outside for a pat frisk. *Id.* Plaintiff contends that after defendant Dawley questioned him about the grievance, defendant Dawley "commenced to choking" him and did not stop until another officer warned him that a sergeant was approaching. *Id.* at 11; Dkt. No. 28 at 8. Defendants seek dismissal of this cause of action because the complaint fails to allege any injuries suffered by plaintiff as a result of defendant Dawley's alleged assault. Dkt. No. 22-1 at 30.

To be clear, plaintiff's complaint does not, as defendants contend, expressly allege that plaintiff suffered an injury as a result of the force used against him by defendant Dawley. While the absence of an injury can be an indication that no excessive force was used and, therefore, the objective element of an Eighth Amendment claim has not been satisfied, *see, e.g., Wilkins*, 559 U.S. at 37 ("The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." (quotation marks omitted)), on a motion to dismiss for failure to state a claim

pursuant to Rule 12(b)(6), all inferences must be drawn in the plaintiff's favor. *See, e.g., Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). Courts, including the Supreme Court, have emphasized that "the core judicial injury [in the context of excessive force claims] . . . [is] not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37 (quotation marks omitted). In light of the allegations in plaintiff's complaint that suggest defendant Dawley applied physical force against plaintiff by choking him after confirming that plaintiff had drafted a grievance against him – and until another corrections officer warned him that as supervisor was approaching – I find that the complaint plausibly alleges that defendant Dawley did not use force against plaintiff in a good-faith effort to restore or maintain order. Accordingly, I recommend that defendants' motion be denied with respect to plaintiff's excessive force claim asserted against defendant Dawley.

IV.    SUMMARY AND RECOMMENDATION

Defendants have moved to dismiss the remaining portions of plaintiff's complaint in its entirety, arguing that the retaliation and excessive force claims that survived the court's initial review fail to state a claim upon

which relief may be granted. Based on my review of the complaint, and mindful of my obligation to liberally construe *pro se* pleadings, I find that, while most of plaintiff's surviving causes of action state a cognizable cause of action, three of his retaliation claims are subject to dismissal.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 22) be DENIED, except with respect to the following claims, which should be dismissed with leave to replead: (1) plaintiff's retaliation claim asserted against defendant Lytle concerning (a) the issuance of a false misbehavior report, and (b) a dormitory transfer; and (2) plaintiff's retaliation claim asserted against defendant Gaffney concerning the issuance of a false misbehavior report.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[9] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

---

[9] If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk modify the court's docket to reflect the correct spelling of defendant Dawley's last name.

David E. Peebles
U.S. Magistrate Judge

Dated:      August 15, 2017
            Syracuse, New York

---

legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.

I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Reginald HOLMES, Plaintiff,
v.
Darwin LECLAIR,[FN1] Supt., Franklin Correctional
Facility; Jhonny White, C.O., Franklin Correctional
Facility; Peter Gray, C.O., Franklin Correctional
Facility; JOhn Doe, Male Nurse; Sgt. Hammond;[FN2]
Beashard,[FN3] C.O.; Reardon, C.O., Defendants.

> FN1. This defendant's name is spelled "LaClair,"
> and the court will refer to defendant with the
> proper spelling of his name.

> FN2. Plaintiff often spells this defendant's name
> "Hamond," however, his name is actually spelled
> "Hammond," and the court will refer to him with
> the proper spelling of his name.

> FN3. This officer's name is spelled "Brassard,"
> and the court will refer to this defendant with the
> proper spelling of his name.

No. 9:09–CV–0437 (TJM/ATB).

Oct. 11, 2012.
Reginald Holmes, pro se.

Aaron M. Baldwin, AAG, for the Defendants.

**REPORT and RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.
   **\*1** This matter was referred for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and
Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas
J. McAvoy, Senior United States District Judge.
   In his amended complaint, plaintiff alleges that
defendants have retaliated against plaintiff by harassing
him and by filing false misbehavior reports at the behest

of defendant White because plaintiff was a witness for
another inmate against defendant White and because
plaintiff later filed grievances against defendant White.
(AC; Dkt. No. 19). Plaintiff also claims that he was
assaulted by defendants Hammond, Brassard, and Reardon
on July 1, 2008; his "religious rights" were violated during
a strip search; and he was transferred to Upstate Special
Housing Unit ("SHU") "as further punishment." (AC ¶¶
11–12, 14). Plaintiff states that the "nurse failed to report
my complaints and injuries that were obviously [shown]
on my body." (AC ¶ 13). Plaintiff seeks substantial
monetary relief and unspecified injunctive relief. (AC ¶
25).

   Presently before the court is plaintiff's motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No.
71). Defendants oppose plaintiff's motion and have
cross-moved for summary judgment. (Dkt. No. 74).
Plaintiff asked for, and was granted, an extension of time
within which to respond to defendants' motion. (Dkt. No.
77 & Text Order dated July 16, 2012). My order gave
plaintiff until August 31, 2012 within which to file his
response, and afforded defendants until September 14,
2012 to file any reply. (Text Order dated July 16, 2012).
Plaintiff did not file a response, and by letter dated
September 13, 2012, defendants state that due to plaintiff's
failure to file a response by the court-ordered deadline,
defendants would not be filing a formal reply. (Dkt. No.
78). Thus the summary judgment motions are fully
submitted, and ready for decision.

**DISCUSSION**

**I. FACTS**
**A. Plaintiff's Allegations**

   Plaintiff first alleges in his amended complaint that he
and Inmate Pryor were issued false misbehavior reports on
June 2, 2008 [FN4] because they "testfied," against defendant
White, on behalf of Inmate Duckett, who was allegedly
assaulted by defendant White.[FN5] (AC ¶ 3). Plaintiff then
claims the abuse "seemed to clearly start" and that he
became the "target" of White's harassment when defendant

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

White "found out" that plaintiff had a pending law suit against the New York Police Department ("NYPD") for "abuse" and "violations" that plaintiff suffered at the hands of the NYPD in Brooklyn.[FN6] (AC ¶ 4).

> FN4. Plaintiff's misbehavior report was written by Officer Barse, who is not a defendant, but who plaintiff claims maintained a "close" relationship with defendant White. (AC ¶ 3).

> FN5. Plaintiff does not specify at what kind of a proceeding he and Inmate Pryor testified, although later in the amended complaint, he states that he was a witness for two different inmates who filed grievances against defendant White. Thus, the court assumes that plaintiff testified at a grievance hearing.

> FN6. Plaintiff claims that defendant White discovered plaintiff's lawsuit because defendant White was often instructed to send plaintiff to the "hospital" to participate in telephone conferences regarding his case. (AC ¶ 4).

Plaintiff states that defendant White's first act of retaliation was "fabricating" a misbehavior report against Inmate Pryor because Pryor filed a grievance against White in June, and plaintiff was a witness for Inmate Pryor's grievance. (AC ¶ 5). Plaintiff claims that the harassment was mostly verbal, including threats to "set plaintiff up" for being a witness against White. (AC ¶ 5). Plaintiff states that he began to feel "uncomfortable" in his housing unit, and he states he filed a grievance against defendant White on June 21, 2008. (AC ¶ 5). On the same date, defendant White filed a false misbehavior report against plaintiff. (AC ¶¶ 5–6). Plaintiff states that on June 28, 2008, he wrote a letter to the Superintendent, defendant LaClair. (Id.) On July 1, 2008, plaintiff claims that Officer Peter Gray, "defendant White's co-worker," wrote a false misbehavior report against plaintiff. (AC ¶ 6). Plaintiff claims that he was the subject of four allegedly false misbehavior reports within a thirty-day period. (Id.)

*2 Plaintiff alleges that his "entire defense during the Disciplinary Hearing," resulting from the June 21st

misbehavior report, was that he was innocent of the charges, and that defendant White and the other officers were retaliating against plaintiff for his testimony on behalf of inmates who filed grievances against defendant White. (AC ¶ 7). Plaintiff states that defendant Superintendent LaClair "neglected his duties as an overseer of his employees" and ignored prisoners' complaints about his officers. (AC ¶ 8).

Plaintiff claims that defendant LaClair did not respond to plaintiff's June 28th letter, but that on June 29 or 30, 2008, plaintiff was called to the school building and questioned in a "nasty and abusive" manner by defendant Hammond, who was "[supposedly]" investigating the grievance.[FN7] (AC ¶ 9). Plaintiff states that defendant Hammond "threatened" plaintiff by telling him that he would be "locked up" if any of plaintiff's witnesses reported anything "different" concerning plaintiff's allegations. (Id.) Plaintiff claims that defendant Hammond interviewed all the witnesses in a "threatening fashion," causing them all to refuse to testify for plaintiff. (Id.)

> FN7. The court assumes that plaintiff is referring to the June 21st grievance because that is the only grievance he had written by that time.

On July 1, 2008, plaintiff claims that defendant Hammond came into plaintiff's dormitory and "roughly dragged" plaintiff out of his cube.[FN8] (AC ¶ 10). Plaintiff claims that his arm was twisted behind his back, and he was snatched by the back of his neck by defendants Hammond, Brassard, and Reardon, who then dragged plaintiff out of the dormitory in "a humiliating manner." (Id.) Plaintiff claims that these officers then pushed his face against a wall and punched him in the ribs and back. Sergeant Hammond squeezed plaintiff's face with both hands, "threateningly" asked plaintiff if he wanted to "do anything" before they put the handcuffs on him, and then smacked him in the back of the head. (AC ¶ 11). Plaintiff was then placed in a van and driven to the Special Housing Unit ("SHU"). When they arrived at the SHU, plaintiff claims that he was snatched by the throat by defendant Brassard, who then threw plaintiff against the wall, pushing on his ribs. (Id.)

> FN8. Within the dormitory, plaintiff's housing

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

unit is referred to as his "cube."

Finally, plaintiff claims that he was "sexually humiliated" during the strip search upon his admission to SHU. (AC ¶ 12). In addition, plaintiff claims that defendant Reardon hit him in the back of the head while plaintiff was naked. Plaintiff states that his "religious beliefs" were violated because of the defendants' actions. (*Id.*) Plaintiff claims that he complained about the injury to the left side of his rib cage, where the "bone was protruding out of the rib area." (AC ¶ 13) However, plaintiff claims that the "nurse" failed to report plaintiff's obvious injuries and complaints. (*Id.*)

Plaintiff was issued a misbehavior report on July 1, 2008 by defendants White and Gray. (AC ¶ 15). He states that he lost good time as a result of this misbehavior report. (*Id.*) Plaintiff claims that he was later transferred to the Upstate Correctional Facility SHU as further punishment and retaliation by defendants LaClair, White, Reardon, Gray, and Brassard. (AC ¶ 14). Plaintiff claims that he sent letters to the Inspector General and the Commissioner, but he got no responses, nor was any investigation conducted regarding his allegations. (*Id.*) Plaintiff then states that all the falsified misbehavior reports diminished plaintiff's chances of being released on parole. (*Id.*)

**B. Defendants' Evidence**

**\*3** In support of their motion for summary judgment, defendants have submitted the declaration of defendant Darwin LaClair and the documents associated with the disciplinary hearings that plaintiff alleges were retaliatory. (Dkt. No. 74–3 (LaClair Decl.), 74–4–74–11, 74–16–74–17; Exs. A–H,[FN9] M–O (Disciplinary Records)). Defendants have included the grievances plaintiff wrote while he was incarcerated at Franklin Correctional Facility, together with the documents related to those grievances. (Dkt. No. 74–12–74–15, 74–21; Exs. I–L, R (Grievance Docs.)) Defendants have submitted plaintiff's Ambulatory Health Record ("AHR") dated July 7, 2008, reflecting an examination prior to entering SHU, and AHRs, dated July 15 and 16, 2008, reflecting an examination at Franklin, prior to plaintiff's transfer, and an examination at Upstate, after his transfer to that facility.

(Dkt. No. 75).

> FN9. A review of the docket sheet shows that there are documents that should be labeled Defendants' Exs. G and H, but they are not so labeled. To avoid any confusion, the court will also refer to the documents by the number that was assigned to them by the court's electronic filing system (CM/ECF).

Defendants have filed the "Statement of Material Facts" required by Local Rule 7.1(a)(3). (Dkt. No. 74–2). Plaintiff has not filed a Statement of Material Facts and has not responded to the defendants' motion.[FN10] Instead of repeating all the facts that the defendants have submitted, the court will cite to the relevant exhibits, as well as relevant parts of defendant LaClair's declaration, during the analysis of the parties' motions for summary judgment.

> FN10. As defendants argue, plaintiff's motion for summary judgment is defective in many respects and could be denied simply because he did not file the required documents. However, due to the liberality with which pro se pleadings are treated, the court will not recommend denying plaintiff's motion on that technical basis alone. Defendants have submitted a properly supported motion, and the court will proceed to consider the merits.

**II. *SUMMARY JUDGMENT***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

*4 If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

### III. *CAUSES OF ACTION*

In order to properly discuss the merits of plaintiff's amended complaint, I will clarify the plaintiff's claims. The amended complaint has a section entitled "Breach of Duty to Protect." (AC ¶ 16(A)–16(D)). Within four subsections, plaintiff appears to be summarizing all his claims. Plaintiff then lists three "Causes of Action," including retaliatory treatment for filing grievances; conspiracy and excessive force; denial of adequate

medical care; and sexually humiliating strip search. (AC ¶¶ 17–23).

FN11. Although plaintiff claims that defendant LaClair failed to take "corrective action," there is no claim that defendant LaClair was aware of, and was deliberately indifferent to, a serious risk of harm to plaintiff prior to the excessive force incidents. *See Farmer v. Brennan,* 511 U.S. 825, 836–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety). The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.* In this case, there are no allegations that any of the defendants failed to protect plaintiff, thus, the court will focus on plaintiff's claims of excessive force. The amended complaint also has a cause of action that purports to be based on "Municipal Liability." (AC ¶¶ 19–20). Plaintiff is suing individuals who work for the State of New York, not a municipality, thus, municipal liability claims do not exist.

The court has read plaintiff's statements and has interpreted his claims as follows:

(1) Defendants White and Gray harassed plaintiff, filed false misbehavior reports, and transferred plaintiff to Upstate in retaliation for the exercise of his first amendment rights to file grievances, to testify on behalf of another inmate, and to file court actions.

(2) On July 1, 2008, plaintiff was subjected to excessive force by defendants Hammond, Brassard, and Reardon, and later subjected to a sexually degrading strip search by the same three defendants, in violation of the First, Eighth and Fourteenth Amendments. Plaintiff may also be claiming that the excessive force was related to the retaliation, and he alleges that these three defendants were involved in his retaliatory transfer.

(3) Defendant LaClair failed to take corrective action against the above violations and was also involved in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

the allegedly retaliatory transfer.

(4) Plaintiff was denied constitutionally adequate medical care.[FN12]

> FN12. In the body of the complaint, plaintiff only alleges that the "nurse" did not report plaintiff's "obvious" injuries after the alleged assault. (AC ¶ 13). In his paragraph entitled "Breach of Duty to Protect," plaintiff alleges that defendants Hammond, Bressard, and Reardon participated in the denial of medical care, but there is no indication of how these defendants denied plaintiff medical care after the incident since plaintiff states that he was examined by the "nurse," who allegedly failed to report his injuries. The one additional paragraph discussing medical care does not elaborate on the claim and is impossible to understand. (AC ¶ 23). Defendants do not address the medical care claim because the nurse was never identified and is not a defendant in this action. Based on the evidence presented, and plaintiff's failure to respond to the defendants' motion, the court will recommend dismissal of this claim sua sponte.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. See Giano v. Goord, 380 F.3d 670, 675–76 (2d Cir.2004) (citing Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)) (exhaustion requirement applies, inter alia, to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. Id. at 675.

**\*5** The failure to exhaust is an affirmative defense

that must be raised by the defendants. Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); Johnson v. Testman, 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. See, e.g, Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. Jones v. Bock, 549 U.S. at 218–19 (citing Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In Woodford, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). Id. § 701.5(d).

The regulations contain an expedited procedure for inmate allegations of harassment or other misconduct by staff. Id. § 701.8. Grievances based upon claims of harassment are forwarded directly to the superintendent, who determines whether the grievance presents a bona fide harassment issue. Id. § 701.8(a)-(c). If appropriate, the superintendent may request an investigation by the Inspector General's Office and must render a decision within twenty-five calendar days of receiving the grievance. Id. § 701 .8(d)-(f). An inmate may appeal the superintendent's decision to the CORC within seven calendar days of receiving the decision, and if no decision is rendered within twenty-five calendar days, the inmate may appeal the grievance directly to the CORC without a decision by the superintendent. Id. § 701.8(g). A final decision by the CORC is required in order to exhaust

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

administrative remedies. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009).

At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[FN13] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

> FN13. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

**\*6** Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford,* it has applied the three-part inquiry in recent cases. *See, e.g., Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009); *Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011). *See also Toliver v. Dep't of Corrections N .Y.C.,* No. 10 Civ. 5807, 2012 WL 4044627, at \*3 n. 4 (S.D.N.Y. Sept.11, 2012) (discussing the absence of a Second Circuit ruling on this issue).[FN14]

FN14. This court also notes that, based upon the concurring opinion in *Woodford,* it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford,* Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 548 U.S. at 104 (Breyer, J. concurring) (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates." Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

Tier II disciplinary proceedings are exhausted by appealing to the Superintendent. N.Y. Comp.Codes R. & Regs., tit. 7 § 253.8. Tier III disciplinary hearings, known as Superintendent's Hearings, are appealed to the Commissioner. *Id.* § 254.8. The *results* of disciplinary hearings are not "grievable." *Id.* § 701.3(e) (1)-(2). Courts have questioned whether including information in a disciplinary appeal regarding the challenged conduct is sufficient to satisfy the exhaustion requirement. *See Johnson v. Testman,* 380 F.3d at 697. The essence of the exhaustion requirement is that the inmate must provide "enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures. *Id.*

In *Johnson,* the Second Circuit held that whether or not the plaintiff's disciplinary appeals were enough to "alert" the defendants to the nature of the alleged wrong was not clear. The Second Circuit sent the case back to the District Court to determine whether plaintiff was justified in raising his complaint about the defendant in his disciplinary appeal, rather than filing a separate grievance,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

and whether the plaintiff's description of the defendant's conduct in the disciplinary appeal was sufficient to afford corrections officials time an opportunity to address the complaints internally. *Id.* at 698 (quoting *Porter,* 534 U.S. at 525).

## B. Application

Defendants argue that the majority of plaintiff's First Amendment claims are unexhausted. Based on the above-cited case law, the court will examine plaintiff's grievances as well as his disciplinary hearings to determine whether he sufficiently alerted the state officials to the nature of the alleged wrongs.

### 1. Grievances and Letters

Plaintiff's first grievance was filed against defendant White after the June 21, 2008 misbehavior report, in which defendant White charged plaintiff with being "untidy," with harassment, and with violating a direct order in conjunction with a disagreement over how plaintiff cleaned his cube. The grievance complained that defendant White used profanity, and stated that defendant White filed the misbehavior report against plaintiff because "he knew [plaintiff] would write [White] up because I have warned him several times in the past 2–months to stop disrespecting me and cursing at me. To justify [himself] C.O. White took my I.D. and placed me on keeplock pending." (Dkt. No. 74–13 at 1).

**\*7** Because the grievance alleged staff misconduct, it was sent to defendant LaClair pursuant to the regulations. On June 30th, Sergeant Hammond interviewed plaintiff and his witnesses. (Dkt. No. 74–13 at 5). Sergeant Hammond interviewed defendant White on July 1, 2008. (*Id.*) Sergeant Hammond found the grievance without merit. (*Id.*) The Superintendent denied the grievance, but plaintiff did not appeal to the CORC. There was no claim of retaliation for the exercise of any first amendment rights in the grievance.

On June 28, 2008, plaintiff wrote a letter to both defendant Superintendent Darwin LaClair and Deputy Commissioner Lucien J. LeClaire, Jr.[FN15] (Dkt. No. 74–14 at 1–7). In this letter (the same letter was sent to both individuals), plaintiff complained about the cleaning incident, and this time, made additional statements, alleging that defendant White threatened plaintiff with

"lockdown" for "whatever I can set you up for." (Dkt. No. 74–14 at 2). In the letter, plaintiff also states that "suddenly today," defendant White found "shanks" near his own "area," but that plaintiff was sure that defendant White would find "a shank or some type of weapon in my cube, or one of my witnesses." (*Id.*) Plaintiff stated that he felt "very threatened" by defendant White, however, there was no claim in plaintiff's June 28th letter that White was retaliating against plaintiff for the exercise of his first amendment rights.

> FN15. Notwithstanding the similarity of the two names, these individuals are two different people.

Plaintiff's June 28th letter to Superintendent LaClair was referred to Lieutenant Larry, and Sergeant DeShane investigated the accusations, finding that plaintiff's grievance was "in retaliation" for the June 21st misbehavior report that defendant White issued against plaintiff. (Dkt. No. 74–14 at 3). Deputy Commissioner LeClaire referred plaintiff's letter to Norman Bezio, the Director of Special Housing/Inmate Disciplinary Programs, for "response." (Dkt. No. 74–14 at 5). Mr. Bezio referred the letter back to defendant LaClair, stating that allegations of staff misconduct should be directed to facility officers through the established grievance mechanism or by writing to the Superintendent. (*Id.*) Although the letters also resulted in an investigation, plaintiff did not properly complete the administrative remedy procedure when he failed to get a satisfactory result from grievance .[FN16] Plaintiff never claimed that White was retaliating against him for the NYPD law suit or because plaintiff testified for Inmate Pryor against defendant White.

> FN16. It appears that the two investigations of the same incident were conducted together. Defendant White's responses are addressed to both Sergeant DeShane (Dkt. No. 74–14 at 4) and to Sergeant Hammond. (Dkt. No 74–13 at 7).

Plaintiff's second grievance was dated July 6, 2008 and filed on July 18,[FN17] after the July 1, 2008 incident that lead to another misbehavior report being filed against

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

plaintiff. (Dkt. No. 74–21; Def.s' Ex. R). Plaintiff alleges that defendant Gray came to his cell and demanded "in a nasty manner," that plaintiff give Gray his I.D. (Dkt. No. 74–21 at 28). Plaintiff claims that he was then taken out of his cell for "unknown reasons," assaulted, and then taken to SHU. In the July 6th grievance, he mentions the assault, and then states that he was assaulted again when he arrived in SHU. He claimed that he did not find out until the next day that he was being "falsely" charged with threatening an officer. (*Id.* at 30). He also stated that he received the misbehavior report in retaliation for filing a grievance against Officer White.[FN18] (*Id.* at 31). He also claimed that the conduct by Gray and White "stemmed" from his being a witness for Inmate Duckett. (Dkt. No. 74–21 at 31). However, he never mentioned the allegedly humiliating strip search, to which he was subjected prior to being admitted to SHU. (*Id.* at 28–34). Nor did plaintiff mention that the nurse did not report his injuries or that he needed or was denied proper medical treatment after the incident. (*Id.* at 29).

FN17. Plaintiff had been transferred to Upstate Correctional Facility by the time the grievance was received by the facility officials.

FN18. Plaintiff can only be referring to the grievance that he filed against defendant White on June 21st because that is the only other grievance he filed at Franklin, and thus, the only grievance against defendant White.

**\*8** The IGRC again passed the grievance through to the Superintendent because it alleged staff misconduct. (Dkt. No. 74–21 at 35). The Superintendent referred plaintiff's claims for investigation, but found that the grievance had no merit.[FN19] (*Id.* at 13, 10) Plaintiff did not appeal this grievance to the CORC. In his appeal to the CORC, plaintiff added the allegation that, upon his arrival at SHU, the strip search was sexually humiliating. (*Id.* at 9). The CORC found no merit to the allegations, and denied the grievance. (*Id.* at 1) In doing so, the CORC noted that "the grievant has raised a separate issue in his appeal statement that was not addressed in his original complaint. That issue could be the subject of a separate grievance." (Dkt. No. 74–21 at 1). Essentially, the CORC did not consider the plaintiff's final allegation because he

raised it for the first time in his appeal to the CORC. Plaintiff never brought a separate grievance. Thus, plaintiff did not properly exhaust his claim of sexual harassment.[FN20] Plaintiff also never brought a grievance, challenging his transfer as retaliatory. He never mentioned his transfer in the appeal of his grievance, although he attempted to add other facts to his appeal, and even though he had been transferred at the time that he filed his appeal. Thus, his claims of retaliatory transfer are unexhausted.[FN21]

FN19. There is a typographical error in the Superintendent's denial of plaintiff's grievance. (Dkt. No. 74–21 at 10). The decision states that the grievance is found to be "with" merit, but then the grievance is denied. Thus, it is clear that the sentence should read "without" merit.

FN20. The court notes that although, in passing, plaintiff also states that this alleged sexual impropriety violated his "religious" rights, there is no mention of religion anywhere in the plaintiff's grievances or disciplinary hearings. Thus, to the extent that plaintiff is attempting to belatedly add a First Amendment religion claim, it is unexhausted and will not be considered.

FN21. Although an inmate may not be transferred solely in retaliation for the exercise of a constitutional right, the inmate has no constitutional right to be incarcerated in any particular correctional facility, and may be transferred for any reason, or no reason at all. *Montayne v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Sher v. Coughlin,* 739 F.2d 77, 80 (2d Cir.1984). *See Meriwether v. Coughlin,* 879 F.2d 1037, 1045 (2d Cir.1989) (officials have broad discretion to transfer inmates, but may no transfer them solely in retaliation for the exercise of their constitutional rights). Aside from his failure to exhaust his administrative remedies, plaintiff asserts only in a conclusory fashion that all the defendants were involved in his transfer. He has no basis for this statement.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

**2. Disciplinary Hearings and Appeals**

Plaintiff had four disciplinary hearings, relating to misbehavior reports that he claims in his amended complaint were filed against him in retaliation for exercising his constitutional right to act as a witness for another inmate as well as for his grievances and/or court litigation. (Dkt. No. 74–4 at 1) (Inmate Disciplinary History). During the hearing on June 12, 2008, for an incident on June 6, 2008, plaintiff stated that "for some reason," the officer [FN22] "had it in for" plaintiff and Inmate Pryor. (Dkt. No. 74–9 at 6).

> [FN22.] Officer Gray wrote the misbehavior report on June 6, 2008. Plaintiff alleges that the officers were all defendant White's friends and were helping him retaliate against plaintiff.

Defendant White filed the June 21, 2008 misbehavior report against plaintiff. At the hearing, held on June 25, 2008, plaintiff alleged that defendant White used profanity against plaintiff, and at the end of the hearing, the hearing officer stated that he would have defendant White's alleged use of profanity against plaintiff investigated. (Dkt. No. 74–11 at 5, 8, 11, 24). Plaintiff also stated that defendant White "had it out for" him. (*Id.* at 8). In his appeal from the hearing officer's determination, plaintiff alleged that defendant White filed the "false" misbehavior report in "retaliation," to cover up for his use of profanity against plaintiff, not in retaliation for grievances or other protected activity. (Dkt. No. 74–10 at 1). Plaintiff made the same statements at the disciplinary hearing that he made in his June 21, 2008 grievance regarding the alleged reason for the misbehavior report.

Plaintiff also had a disciplinary hearing as the result of the July 1st misbehavior report. The hearing officer found plaintiff guilty of the misbehavior and sentenced plaintiff to a period of time in SHU and a one month loss of good time. (Dkt. No. 74–4 at 1). During the hearing, plaintiff argued that defendant White was retaliating against plaintiff for filing grievances against him, but never mentioned that plaintiff had been a witness for another inmate's grievance against White, even though he did mention his testimony on behalf of another inmate in his July 6, 2008 grievance. (Dkt. No. 74–17 at 3). Plaintiff told the hearing officer that it was the fifth time that

defendant White used obscene language against plaintiff "and I never wrote him up before." (*Id.*) Unfortunately, the second part of the disciplinary hearing was inaudible, and could not be transcribed. (*Id.* at 5).

**\*9** The issues that appear to be exhausted are the two alleged assaults on July 1, 2008 (one on the housing unit and the second while plaintiff was being admitted to SHU on the same day) and false misbehavior reports in retaliation for filing grievances against defendant White beginning on June 25, 2008 (when plaintiff filed his first grievance against defendant White) and perhaps the claim that White was also retaliating against plaintiff because he testified on behalf of other inmates, against defendant White.[FN23] Although these are the only issues that are exhausted, the court will consider some of the other issues because there are alternative reasons for their dismissal.

> [FN23.] It is questionable whether this claim was ever brought to the state officials properly, but given the liberality with which pro se cases are treated, the court will consider that this claim is exhausted.

**V. *RETALIATION***

**A. Legal Standards**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

right, substantive due process rights are implicated even if the plaintiff were entitled to, and did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* In the disciplinary hearing context, the type of evidence required to establish a causal connection between plaintiff's protected activity and the defendant's alleged adverse action includes: temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden,* No. 3:10–CV–1839, 2012 WL 668996, at *7 (D.Conn. Feb.9, 2012) (citing *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007)).

**\*10** Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Once the plaintiff's burden of proving the three-part test is satisfied, "the burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have

been taken based on the proper reasons alone. *Graham,* 89 F.3d at 79 (citations omitted).

**B. Application**

**1. First Three Misbehavior Reports**

In the amended complaint, plaintiff alleges that the June 2, 2008 misbehavior report was issued by Officer Barse to both plaintiff and Inmate Pryor because they testified on behalf of Inmate Duckett, who was allegedly assaulted by defendant White. (AC ¶ 3). Plaintiff also claims that this misbehavior report was filed against plaintiff because defendant White discovered that plaintiff had a pending law suit against the N.Y.P.D. Intelligence Division.[FN24] (AC ¶ 4). Filing grievances, and filing lawsuits are all protected by the First Amendment, thus, retaliation for this conduct would be actionable. *See Tafari v. McCarthy,* 714 F.Supp.2d 317, 373 (N.D.N.Y.2010) (filing grievances). However, it was unclear in 2008, and is still unclear, whether testifying on behalf of another inmate would be protected conduct. *See e.g. Pettus v. McGinnis,* 533 F.Supp.2d 337, 340 (W.D.N.Y.2008) (court found no authority in 2008 clearly establishing that an inmate's testimony on behalf of another inmate was constitutionally protected). *See also Lewis v. Johnson,* 9:09–CV–482 (TJM/ATB), 2010 WL 3785771, at *15, 22 (N.D.N.Y. Aug. 5, 2010) (Report–Recommendation) (also affording qualified immunity, notwithstanding possibility that adverse action was motivated by inmate's complaints about the treatment of another inmate), *adopted* 2010 WL 3762016 (N.D.N.Y. Sept.20, 2010).[FN25]

**FN24.** Plaintiff cannot claim that the June 2, 2008 misbehavior report was in retaliation for filing grievances against defendant White because plaintiff's first grievance against this defendant was not filed until June 21, 2008.

**FN25.** The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

An analysis of the other factors required for a retaliation claim shows that plaintiff cannot establish a causal connection between his protected activity and the defendants' adverse action. Additionally, a review of the disciplinary hearings shows that defendants would have taken the same action regardless of any "improper" motive in bringing the disciplinary charges.

Defendants' Exhibit C is the hearing packet for the June 4, 2008 disciplinary hearing. (Dkt. No. 74–6). The packet contains the plaintiff's misbehavior report, the disposition sheet, and a letter that plaintiff wrote to defendant LaClair the day before the hearing. (Dkt. No. 74–6 at 4, 5–7). Defendant LaClair wrote a note at the top of plaintiff's letter, stating that the letter was a "Prehearing Statement" and that it would be considered by the hearing officer at the June 4, 2008 hearing. (*Id.* at 5). Exhibit C also contains plaintiff's appeal to the Superintendent of the disciplinary hearing and the order affirming the hearing officer's finding, signed by the Superintendent's designee, Captain Williams. (*Id.* at 9).

**\*11** The court would first point out that, contrary to plaintiff's claim, Inmate Pryor was not involved in this misbehavior report, although plaintiff testified at his disciplinary hearing that Inmate Pryor was present at the time. (Dkt. No. 74–7 at 4; Def.'s Ex. D). The misbehavior report charges plaintiff with disobeying Officer Barse's order to punch out at the Tailor Shop. The report specifically states that there were *no* other inmates involved in the misbehavior. (Dkt. No. 74–6 at 4). The misbehavior report states that plaintiff was standing by the time clock five minutes after Officer Barse had given the order for all inmates to punch out, and that plaintiff held his card over the time clock for an additional 30 seconds before he punched out. Officer Barse also noticed that plaintiff punched out for another inmate, but could not determine who that inmate was because plaintiff put the card on the rack before Officer Barse could make that determination.[FN26]

[FN26.] That inmate's identity remains unknown, and there is no indication that the inmate for whom plaintiff was punching out was Pryor, even though Pryor was apparently in the Tailor Shop

at the same time. In any event, according to the documents there was no misbehavior report issued to any other inmates *as a result of this incident.*

A review of the disciplinary hearing shows that plaintiff pled "[n]ot guilty with explanation." (Dkt. No. 74–7 at 3; Def.'s Ex. D). At the hearing, plaintiff rescinded his request for the two witnesses he had chosen. (*Id.*) Plaintiff explained that the civilian supervisor would call "tools" at approximately 5:15 p.m. However, plaintiff was required to pray every day at approximately 5:15 or 5:20 p.m., and "everybody in the shop knows I do that.... I sit in the chair and I do my prayer." (*Id.* at 4). Plaintiff states that he is the last one to be frisked because of that. He, Spencer, and Pryor were the last ones to get frisked. (*Id.*) Plaintiff states that it was 5:29 p.m., and he heard Officer Barse say "I am locking the door now get [sic.]" Plaintiff admits that he heard Officer Barse, but did not know to whom the officer was speaking, "so I held my thing there for thirty seconds and then I punched out *I should have punched out right away."* (*Id.*)

Plaintiff essentially admitted the conduct that formed the basis for the misbehavior report. Additionally, although plaintiff stated that everybody in the shop knew that he prayed at a certain hour, he also stated in response to a question from the hearing officer, that Officer Barse was *not* the regular officer in the Tailor Shop, and that it was the "first time [plaintiff] saw him working there since I been working there for about two months." (*Id.* at 5). Thus, it is clear that Officer Barse would not have known that plaintiff prayed everyday at a certain hour or that he punched out after everyone else because, according to plaintiff, it was the first day that Officer Barse ever worked in the Tailor Shop. The hearing officer then told plaintiff that different officers did things differently, not to "assume things," and to check with the officer to make sure that "things don't get jammed up." (*Id.*) The hearing officer then stated that plaintiff could have obeyed Officer Barse's order in a more timely fashion. (*Id.*)

**\*12** Based upon the plaintiff's own testimony, admitting that he held his card over the time clock for 30 seconds before he punched out and that Officer Barse was not aware of plaintiff's alleged routine in the Tailor Shop,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

it is clear that the misbehavior report would have been written without any retaliatory motive. Plaintiff did not understand why he was found guilty of "being out of place" since he was in the Tailor Shop where he was supposed to be. (*Id.* at 7). However, the hearing officer explained that he was "out of place" because the officer told him to leave, and he stayed. (*Id* .)

The hearing officer at the June 4th hearing also discussed a February 20, 2008 misbehavior report because plaintiff had included a discussion of that incident in the letter that he sent to the Superintendent. (*Id.* at 6). Although plaintiff is not challenging, and did not exhaust his remedies with respect to, the February 20th incident, it is clear from the discussion of the incident that plaintiff committed the conduct of which he was accused in February.[FN27] (*Id.*) The incident involved a disagreement over where plaintiff was going to sit in the mess hall. Plaintiff explained that he mistakenly sat in a spot that was reserved for people who are helping inmates in wheelchairs. Plaintiff stated that he was following someone else and did not hear the officer speak to him, so "I didn't hear him okay and he had to tell me a second time. Then Officer Allen ... wrote the ticket. He cursed at me in the messhall." (*Id.*) Plaintiff alleges that later, the Officer grabbed his arm, but plaintiff stated that the incident had been "dealt with." (*Id.*) Defendant White was *not* involved in either of these incidents.

FN27. The court is only mentioning this incident for purposes of solidifying its recommendation regarding the lack of any evidence of false misbehavior reports/retaliation in this case.

The third misbehavior report was dated June 5, 2008, and was issued by Officer Gray. (Dkt. No. 74–8 at 4; Def.s' Ex. E). Plaintiff was charged with failure to obey a direct order and violating "count procedures." (*Id.*) Plaintiff was sleeping during the inmate count and Officer Gray had to wake him. Plaintiff had been previously warned about this conduct. (*Id.*) The disciplinary hearing was conducted on June 12, 2008. The charge of disobeying an order was dismissed by the review officer prior to the hearing, and the documents indicate that plaintiff pled *"guilty"* to the "count" violation. (*Id.* at 3). The hearing transcript confirms this finding. (Dkt. No.

74–9 at 3–4; Def.s' Ex. F). Plaintiff stated "well I'll plead guilty with explanation cause I was laying down." (*Id.* at 4). He then admitted that "I was sleeping and [the officer] kicked my bed." (*Id.*)

Later during the July 12th testimony, plaintiff states that Officer White "got it in for me and him, alright." (*Id.* at 6). Plaintiff admitted that he was sleeping, but claimed that the officer should have given him a warning. (*Id.*) The hearing officer pointed out that there were warnings to plaintiff listed in the log book. (*Id.* at 7; *see* Dkt. No. 74–16 at 5 (indicating a warning to Holmes on 4/20/08 and 5/14/08)). The officer asked plaintiff why he was pleading guilty if he believed he should have been warned, but plaintiff stated that "I plead guilty because I was sleeping. I won't lie." (*Id.*) Regardless of plaintiff earlier allegation about White, who was not the individual who gave him this ticket, had it "in for" plaintiff, his admission that he was guilty and the documents showing that he was warned in the past, support the defense that the misbehavior report would have been issued for completely appropriate reasons.

**\*13** Plaintiff has not shown any nexus between his "protected" activity and the first three misbehavior reports. Plaintiff did not write his first grievance against defendant White until after the fourth misbehavior report was written, so the first three could not have been in retaliation for writing grievances. As stated above, in 2008, it was not clear that plaintiff's alleged testimony on behalf Inmate Pryor against defendant White was constitutionally protected. Plaintiff's assumption that defendant White was the instigator of the misbehavior reports is completely speculative because White did not write any of the first three misbehavior reports. Finally, plaintiff was found guilty of all three violations, and in fact, pled guilty to one of them. Thus, it is clear that defendants have shown that the same actions would have been taken, regardless of a retaliatory motive.

The fourth misbehavior report was issued for an incident that occurred at approximately 8:45 a.m. on June 21, 2008. This was the first incident in which defendant White was the charging officer. The misbehavior report resulted from a disagreement between plaintiff and defendant White over how plaintiff's cell should be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

cleaned. (Dkt. No. 74–10 at 5–6). This misbehavior report could not have been written in retaliation for grievances against White himself since plaintiff's first grievance against White was written on the same day of the incident that formed the basis of the misbehavior report, complaining about White's behavior during the incident. In his amended complaint, plaintiff alleges that the "harassment and abuse seemed to clearly start after defendant White found out that plaintiff ... had a pending law-suit against the N.Y.P.D. ...." (AC ¶ 4). Plaintiff also states that his "entire defense" during the resulting disciplinary hearing was "the circumstances surrounding plaintiff being a witness for two different inmates" who had filed grievances against defendant White. (AC ¶ 7).

Plaintiff's conclusory assertion that the harassment *seemed* to start after defendant White found out about a law suit against police officers from New York City does not rise to the level of the required nexus between adverse action and plaintiff's protected conduct.[FN28] Plaintiff claims that defendant White "found out" about the law suit when he escorted plaintiff to telephone conferences with the court. Even assuming that defendant White was aware of plaintiff's law suit against individuals from the N.Y.P.D., these individuals did not work with White at Franklin, they did not work in the same city as he did, and did not even work for the Department of Corrections and Community Supervision ("DOCCS"). Plaintiff's completely speculative assumption that the alleged harassment that followed was based upon this "discovery," particularly when the first three misbehavior reports were not written by defendant White, does not form the basis for a constitutional retaliation claim. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec.

22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action).

> FN28. The court may take judicial notice of the fact that plaintiff filed two law suits, one in the Eastern District of New York, and the other in the Southern District of New York close to the time of the conduct of which plaintiff complains in this case. *See Holmes v. Dep't of N.Y.P.D.,* 06–CV–2140 (E.D.N.Y.) (RJD/LB); *Holmes v. Frasier,* No. 07 Civ. 6044 (S.D.N.Y.) (LAK). A letter, filed in *Holmes v. Dep't of NYPD,* indicates that both cases were settled in plaintiff's favor on May 6, 2008. (Dkt. No. 44 in 06–CV–2140).

**\*14** Attached to plaintiff's motion for summary judgment is an unsworn statement written by Inmate Jarrett Henry, in which he states that he told plaintiff that Inmate Henry "always" heard defendant White talking about plaintiff and his law suit against the N.Y.P.D., "saying things like [plaintiff] is going to learn the hard way not to mess with the Big Blue." (Dkt. No. 71 at 6). An unsworn, unsigned, undated statement cannot form the basis for a summary judgment motion, and plaintiff did not respond to the argument in defendants' motion that this document should not be considered.

Although plaintiff states that the "entire" defense at his disciplinary hearing was that defendant White was retaliating against him, a review of the disciplinary hearing transcript shows that plaintiff made no such argument during his disciplinary hearing. Plaintiff's defense was that he properly cleaned his "cube," and that defendant White used profanity against plaintiff. Plaintiff claimed at the hearing, and on appeal of that hearing, that defendant White wrote the misbehavior report to cover up his own use of profanity against plaintiff, not that White was retaliating against plaintiff for an unrelated law suit or for grievances that had not yet been written.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

Plaintiff stated once during the June 25th hearing that "[h]e's been, and, he's had it out for me for the longest ... ok?" (Dkt. No. 74–11 at 8) (omission in original). Plaintiff also stated that White "threatened" plaintiff four times to "write [plaintiff] a ticket." (*Id.* at 6). Plaintiff's appeal stated that White's report was "clear retaliation to cover up his useing [sic] profane language on Mr. Holmes." (Dkt. No. 74–10 at 1). There is **no indication** from the disciplinary hearing or from the appeal that plaintiff believed defendant White was retaliating against him for the exercise of a constitutional right.

The same is true for the grievance, written by plaintiff on June 21, 2008 after defendant White wrote the misbehavior report that was dated the same day. The basis of the grievance was the defendant White allegedly used profanity in dealing with plaintiff, during the incident that resulted in the misbehavior report. Plaintiff never mentioned retaliation at all. (Dkt. No. 74–13 at 1). In the grievance, plaintiff states that defendant White knew that plaintiff would "write him up" because plaintiff had warned defendant White several times in the past **two months** to stop "disrespecting" plaintiff and "cursing" at him. (*Id.*) Plaintiff states that "[t]o justify his [sic] self C.O White took my I.D. and placed me on keep lock pending." (*Id.*) Verbal harassment and profanity, no matter how unprofessional and offensive does not rise to the level of a constitutional violation. *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (a guard calling a plaintiff names did not establish any "appreciable injury" and dismissal of the claim was proper).

**\*15** On June 28, 2008, plaintiff wrote a letter to the Superintendent, still complaining about the June 21st incident, but adding that on June 28, 2008, defendant White found "shanks" around his own desk area. (Dkt. No. 74–14 at 2; Def.s' Ex. K). Plaintiff then stated that he was afraid that defendant White would "plant some weapon" in plaintiff's cell or the cell of one of his "witnesses." (*Id.*) This was complete speculation by plaintiff, and he never mentioned retaliation.

**2. Final Misbehavior Report**

The final misbehavior report, written on July 1, 2008, before plaintiff was transferred out of Franklin, was written by Officer Gray,[FN29] and involved plaintiff having a verbal exchange with this officer, ultimately telling Officer Gray that there was a "shank" with his name on it. (Dkt. No. 74–16 at 4; Def.s' Ex. M). Plaintiff was given a Tier III hearing, and was found guilty of the misbehavior. He was sentenced to three months in SHU, together with a three month loss of various privileges. (Dkt. No. 74–16 at 1). Plaintiff was also sentenced to a one month recommended loss of good time. (*Id.*) Plaintiff appealed, but the determination was affirmed on August 14, 2008. (Dkt. No. 74–18 at 1).

FN29. Once again, the misbehavior report was not written by defendant White.

Although the transcript of the Tier III hearing was mostly "inaudible," and the transcription was never completed, it is clear that plaintiff was complaining about Officer White swearing at him. (Dkt. No. 74–17 at 3; Def.s' Ex. N). In the part of the transcript that is available, there is no allegation of why plaintiff believed that Officer White was allegedly targeting plaintiff for profanity or false misbehavior reports. The court notes that the plaintiff brought his June 28th letter to the hearing, and before the tape became inaudible, the hearing officer stated that he would consider the letter in his decision. (*Id.* at 5).

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a section 1983 action, seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486–87. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) extended the rationale in *Heck* to section 1983 challenges to prison disciplinary proceedings in which a decision in plaintiff's favor would necessarily reverse the administrative decision revoking a plaintiff's good-time credits, thereby affecting the length of the plaintiff's confinement. 520 U.S. at 644.

In this case, although plaintiff is not challenging the due process rights afforded to him at his hearing,[FN30] if the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

court determines that Officer White's misbehavior report was false and in retaliation for plaintiff's grievances or other constitutionally protected activities, then the court would necessarily be finding that the result of the disciplinary hearing was invalid. However, as stated above, plaintiff's disciplinary hearing was affirmed on appeal, and plaintiff did not challenge the finding in an Article 78 proceeding. Thus, at this time, the court cannot consider the last misbehavior report on the merits of his retaliation claim.[FN31] Plaintiff cannot sustain his burden to show that there is no question of fact, and summary judgment should be granted in his favor, nor has he refuted the defendants' showing that there is no question of fact, but that summary judgment may be granted in their favor on the retaliation claim.

> FN30. Although the amended complaint refers to a denial of "due process," none of the hearing officers are defendants, and a review of all the hearings shows that plaintiff was afforded the required procedural due process during the hearings. He does not allege otherwise.

> FN31. The Second Circuit has held that an inmate who is given a "mixed sanction" can avoid the "favorable termination" rule of *Heck* and *Edwards* if he forever waives any consideration of the good time portion of his disciplinary sentence. *Peralta v. Vasquez,* 467 F.3d 98, 104–106 (2d Cir.2006), *cert. denied,* 551 U.S. 1145, 127 S.Ct. 3006, 168 L.Ed.2d 726 (2007). In such cases, the court would afford plaintiff the opportunity to waive any consideration of the good time. However, in this case, regardless of plaintiff's waiver, he still could not show that defendant Gray, who wrote the July 1st misbehavior report, was retaliating against plaintiff for a grievance that he filed against defendant White or that defendant Gray was retaliating against plaintiff at the behest of defendant White for a law suit that plaintiff filed against the NYPD. There is no indication that defendant Gray was aware of the law suit filed by plaintiff.

## VI. *EIGHTH AMENDMENT/EXCESSIVE FORCE*

### A. Legal Standards

**\*16** The Eighth Amendment prohibits the " 'unnecessary and wanton infliction of pain.' " *Baker v. Willett,* 42 F.Supp.2d 192, 196 (N.D.N.Y.1999) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.(1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321. Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson,* 503 U.S. at 9–10 (de minimis force); *Johnson v. Glick,* 481 F.2d at 1033.

### B. Application

In the amended complaint, plaintiff only refers to July 1, 2008 as the date that he was allegedly subjected to excessive force.[FN32] He claims that he was assaulted at his cell and when he arrived at SHU, where he was hit again and subjected to a sexually humiliating strip search. However, the conduct described by plaintiff as having occurred on July 1, 2008 does not rise to the level of excessive force, even as plaintiff has described it. As stated above, verbal abuse and harassment, no matter how offensive or inappropriate, does not rise to the level of a constitutional claim. *Purcell, supra.* Plaintiff describes the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

"excessive force" on July 1, 2008 as Sergeant Hammond "roughly dragged" plaintiff out of his cell. (AC ¶ 10). Plaintiff's arm was "twisted behind his back and he was snatched by the back of his neck by defendants Sgt. Hammond, and Corrections Officers [Brassard] and Reardon." (*Id.*) The officers then "dragged" plaintiff out of the dorm in a "humiliating manner." (*Id.*)

FN32. The court notes that, in his motion for summary judgment, plaintiff now mentions an alleged "use of force incident" that occurred on February 20, 2008. (Dkt. No. 71 at 2, ¶ 4). This is the first time in this case that plaintiff has mentioned an incident involving a "use of force," occurring on February 20, 2008. Defense counsel interpreted plaintiff's statement as an attempt to raise a new claim in his summary judgment motion and argued that this claim is unexhausted. (Def.s' Memo. at 14–15). If plaintiff were trying to raise a new claim, he could not do so in a summary judgment motion, even if he had filed a proper motion. *See Hickey v. State Univ. of New York at Stony Brook Hosp.*, No. 10–CV–1282, 2012 WL 3064170, at *5 (E.D.N.Y. July 27, 2012) (citations omitted). The court finds, however, that plaintiff is not attempting to raise a new claim. First, although plaintiff mentions a use of force on February 20, 2008, he does not state how the use of force relates to a constitutional violation. A reading of the entire paragraph shows that the reason he is mentioning a use of force on February 20, 2008 is because he is attempting to argue that defense counsel lied in his response to plaintiff's interrogatories, when counsel stated that there were no unusual incident reports or use of force reports pertaining to plaintiff while he was housed at Franklin Correctional Facility. Plaintiff claims that the incident was "reported," implying that defendants have failed to produce existing records. Defendants have submitted a misbehavior report, issued to plaintiff on February 20, 2008, together with the documents associated with the Tier II hearing that ultimately resulted from that report. (Dkt. No. 74–5 at 4). There is no indication from the misbehavior report or from the hearing on the misbehavior

report that plaintiff claimed that any use of force occurred before, during, or after the incident.

The misbehavior report involved an incident that occurred in the mess hall, during which plaintiff sat in an unauthorized spot and then complained about having to move. (*Id.*). When Officer Allen attempted to counsel plaintiff about his behavior, plaintiff swore at him. (*Id.*) Plaintiff was found guilty after a Tier II hearing, but did not appeal. Plaintiff appears to have discussed the issue briefly in his letter to defendant LaClair, dated June 3, 2008, that plaintiff wrote after he was issued the June 2, 2008 misbehavior report. (Dkt. No. 74–6 at 5).

Plaintiff states in the second paragraph of his June 3, 2008 letter that the June 2 misbehavior report was his "second Tier II ticket," and that the officer "lied on" plaintiff the first time, but that plaintiff did not appeal the guilty determination. (*Id.*) Although it is not clear, the court assumes that plaintiff is referring to the February 20, 2008 incident because plaintiff claims that the officer "grabbed" plaintiff's arm "roughly in the mess hall in front of over 50 prisoners," and that this action "embarrassed" the plaintiff in front of all the other prisoners. (*Id.*) He then states that a short sergeant "roughed me up" outside of the mess hall by pushing plaintiff's face into the wall and throwing handcuffs on him tightly. (Dkt. No. 74–6 at 6).

Plaintiff also admits in the June 3, 2008 letter, that he "didn't ... write ... and complain or place an appeal in for their decision." (*Id.*) It is clear from plaintiff's own letter that he never complained about any "use of force" at the time that it allegedly occurred. The misbehavior report corroborates this finding. (Dkt. No. 74–6 at 4). Question No. 9 on the misbehavior report form specifically asks whether physical force was used, and Officer Allen checked "NO." (*Id.*) Thus, plaintiff's allegation that defense counsel committed

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

some sort of misconduct by failing to turn over "use of force" reports, based on this February 20, 2008 incident, is meritless.

Plaintiff also claims that when he reached the entrance of the dorm, his face was pushed against the wall, he was punched in the left ribs and the back, and his face was "squeezed" while Sergeant Hammond allegedly threatened him, "smacked" plaintiff in the back of the head and "threw" him into the back of the van to drive to SHU. (AC ¶ 11). Plaintiff claims that when they arrived at SHU, he was "snatched by the throat and neck" by defendant Brassard and pushed up against the wall by his ribs and the back of his head. (*Id.*) Finally, plaintiff alleges that the strip search was performed in a "sexually" humiliating manner, because the officer made plaintiff spread his buttocks so that he "felt" molested.[FN33] (AC ¶ 12).

> [FN33.] Even if plaintiff had exhausted his strip frisk claim, he alleges that the officers made fun of him, threatened him, and looked at him for an extended period of time, asking him to spread his buttocks, and making other demeaning comments. (AC ¶ 12). While allegations of sexual abuse may, in some circumstances, violate the Eighth Amendment, isolated incidents of harassment, involving verbal harassment and even touching are not severe enough to be "objectively, sufficiently serious." *Boddie, v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997).

**\*17** The defendants allege that plaintiff was transferred to SHU on July 1, 2008, without incident and without injury. They also allege that the routine strip search was required for admission to SHU and was conducted in the proper manner. *See* DOCCS Directive No. 4910(IV)(D)(1) (inmates are to be strip frisk upon entry to SHU). The only defendants allegedly involved in this use of force were Hammond, Brassard, and Reardon.

In the amended complaint, plaintiff now claims that he complained about the injury to the left side of his rib cage, and that the "bone was protruding out of the skin." (AC ¶ 13). However, in his grievance, dated July 6, 2008, he stated that he "was hit in the ribs and in the back of the head *not to cause injury, or to have injury shown on my*

*body,* but hit and slapped to be humiliated with malice and disrespect tying to provoke me to strike back, but I held myself and refused to be tricked into catching an assault on an officer." (Dkt. No. 74–21 at 29) (emphasis added). Plaintiff wrote this document *five days* after the incident. If plaintiff's rib had been protruding from his skin on July 1, it is hard to believe that plaintiff would have written this grievance without complaining about an obviously broken rib.

The plaintiff's medical records also belie his assertion of a broken rib. On July 7, 2008, plaintiff was examined in SHU. (Dkt. No. 75 at 2). He was viewed in shorts. There were no marks, bruises or opened or reddened areas. Plaintiff denied injury. (*Id.*) Plaintiff was examined again prior to his transfer to Upstate on July 15, 2008. (*Id.* at 3). Even assuming that he was not properly examined at Franklin,[FN34] plaintiff was examined upon his admission to Upstate Correctional Facility on July 16, 2008. (*Id.* at 4). Plaintiff denied any "current" medical complaints at that time. (*Id.*)

> [FN34.] One of plaintiff's claims was that he was denied adequate medical treatment by a John Doe defendant "after the assault sustain[ed] from defendants Sgt. [Hammond], and C.O. [Brassard] and Reardon ...." (AC ¶ 16(D)). No medical John Doe defendant was ever identified or served. However, it is clear that plaintiff had no injuries either when he left Franklin or when he arrived at Upstate. Any medical care claim would also be subject to dismissal.

By the time that plaintiff appealed the denial of his grievance on August 24, 2008, plaintiff left out the statement, admitting that he had no injury and instead claimed that he was hit in the ribs twice. (Dkt. No. 74–21 at 8). He was allegedly punched on the left side of his rib cage before he was taken to SHU and punched on the right side of his rib case after he arrived at SHU. (*Id.*)

Plaintiff's own *contemporaneous* statements and his medical records show that whatever force was used did not cause any injury. Although the lack of injury is not fatal to an excessive force claim, the extent and nature of an injury, if any, " 'is probative of the amount and type of

Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)

(Cite as: 2012 WL 5880360 (N.D.N.Y.))

force actually used ... and that in turn is likely to reflect on the reasonableness of that force [.]' " *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 390 (S.D.N.Y.2009); *Washington v. Parr,* 561 F.Supp.2d 394, 407 (S.D.N.Y.2008) (finding de minimus injury to be probative of de minimus force)), *report-recommendation adopted by* 2011 WL 3478312 (S.D.N.Y. Aug.8, 2011). Defendants dispute that any force was used at all. (Dkt. No. 74–21; Def.s' Ex. R at 19–20, 24, 25 (Memoranda by Hammond, Brassard, and Gray, Responding to Grievance)).

**\*18** As a general rule, at the summary judgment stage, courts must not weigh evidence or assess the credibility of witnesses. *Scott v. Coughlin,* 344 F.3d 282, 290–91 (2d Cir.2003). However, in the "rare circumstances where plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005). *See also Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (conclusory allegations are insufficient to state a claim for relief under section 1983); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ( "mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

In this case, it is not simply plaintiff's word against the officers. Most of the statements in plaintiff's amended complaint describing this incident would not rise to the level of constitutional violations, except for the punch to plaintiff's ribs. Plaintiff filed a grievance five days after the incident and specifically stated that he was not injured, but the defendants treated him roughly in order to "humiliate" him. Plaintiff never mentioned the alleged use of force during his disciplinary hearing, although it is clear that he was alleging some sort of retaliation by the officers. In his amended complaint, filed approximately one year after the incident, plaintiff now claims that his rib was sticking out of his skin. The medical reports at both

Franklin and Upstate, a facility that has nothing to do with the incident and to which plaintiff was transferred a week after the incident, indicate that plaintiff claimed no injuries. At worst, plaintiff claims that defendants swore at him and he was treated roughly while being handcuffed and escorted to SHU. Plaintiff has not responded or opposed the defendants' motion for summary judgment, thus, this court finds that there are no genuine issues of material fact, and defendants's motion for summary judgment may be granted on plaintiff's claim of excessive force.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 71) be **DENIED,** and it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 74) be **GRANTED** and the amended complaint be **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2012.

Holmes v. LeClair
Not Reported in F.Supp.2d, 2012 WL 5880360 (N.D.N.Y.)
END OF DOCUMENT

Not Reported in F.Supp.2d, 2012 WL 5880690 (N.D.N.Y.)

(Cite as: 2012 WL 5880690 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Reginald HOLMES, Plaintiff,
v.
Darwin LECLAIR, Supt., Franklin Correctional Facility,
et al., Defendants.
No. 9:09–CV–437.

Nov. 21, 2012.
Reginald Holmes, Gouverneur, NY, pro se.

Aaron M. Baldwin, New York State Attorney
General-Albany Office, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action pursuant to 42
U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter,
United States Magistrate Judge, for a
Report–Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c).

The Report–Recommendation dated October 11,
2012 recommended: (1) Plaintiff's motion for summary
judgment (Dkt.# 71) be denied; (2) Defendant's motion for
summary judgment (Dkt.# 74) be granted; and (3)
Plaintiff's amended complaint be dismissed in its entirety
as to all Defendants.

Plaintiff filed timely objections to the
Report–Recommendation, essentially raising the same
arguments presented to the Magistrate Judge in his motion
for summary judgment (Dkt.# 71) and his motion to stay
and/or for extension of time (Dkt.# 77). Plaintiff restates
his conclusory claims against Defendants and concentrates
heavily upon the denial of his motion to stay and/or for an
extension of time, stating this Court in fairness should
grant him such relief. Nothing in Plaintiff's Objections
show that there is a genuine issue of material fact for trial.

When objections to a magistrate judge's
Report–Recommendation are lodged, the Court makes a
*"de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such
a review, the Court may "accept, reject, or modify, in
whole or in part, the findings or recommendations made
by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate
judge with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the Plaintiff's objections,
this Court has determined to accept in its entirety the
recommendation of Magistrate Judge Baxter for the
reasons stated in the ReportRecommendation.

It is therefore **ORDERED** that (1) Plaintiff's motion
for summary judgment (Dkt. # 71) be **DENIED;** (2)
Defendant's motion for summary judgment (Dkt.# 74) be
**GRANTED;** and (3) Plaintiff's amended complaint be
dismissed in its entirety as to all Defendants.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

Holmes v. LeClair
Not Reported in F.Supp.2d, 2012 WL 5880690
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 5339151
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Emanuel M. BROOKS, Plaintiff,

v.

Correction Officer K. JACKSON, et al., Defendants.

No. 11 Civ. 6627(JMF).
|
Sept. 23, 2013.

OPINION AND ORDER

JESSE M. FURMAN, District Judge.

**\*1** Plaintiff Emanuel M. Brooks, a state prisoner proceeding *pro se,* brings this action pursuant to Title 42, United States Code, Section 1983, claiming violations of his constitutional rights during his incarceration at Sing Sing Correctional Facility ("Sing Sing") and Attica Correctional Facility ("Attica"). He also brings a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Brooks sues Correctional Officers K. Jackson, M. Darden (incorrectly identified as "Darken" in the Amended Complaint), D. McCurdy, and B. Carver—all current and former employees of the New York State Department of Correctional Services ("DOCS")—in their individual and official capacities. [1] He also names DOCS as a defendant in his opposition papers. (Opp'n 15 (Docket No. 56)). Defendants move to dismiss the Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

Although Brooks is presently incarcerated at Clinton Correctional Facility, his allegations relate to his previous incarceration at Sing Sing and Attica. In particular, most concern an alleged incident with Officer Jackson at Sing Sing on or about April 17, 2009. [2] According to Brooks, Officer Jackson questioned him in the C Gallery of Building 5 as to what he had in his pants. She also told him to lift his pant-legs and open the crotch area of his pants, and conducted two pat-and-frisks on him—at least one of which (and perhaps both of which, as the record is not clear) occurred after he had informed her that he was Muslim and preferred to be searched by a male officer. (Am. Compl. § II.A (Docket No. 24); Opp'n 9). Brooks alleges that Officer Jackson later called him to her office, ordered him against the wall, and sexually and physically abused him. (Opp'n 9–10; Am. Compl. § II.A). Specifically, Brooks alleges that Officer Jackson hit him in his groin, grabbed and pulled his genitals, and put her finger in his anus. (Am.Compl.§ III). After Brooks asked Officer Jackson for her name, Brooks claims that she told him not to tell anyone about the incident and threatened to "get" him if he reported her. (Opp'n 10). Nevertheless, he returned to his cell and filed a grievance against her. (*Id.*)

Brooks claims that, later the same day, in retaliation for the grievance he had filed against Officer Jackson, three officers—Defendant Officers McCurdy and Darden, as well as another unidentified individual—assaulted, threatened, and harassed him. (Am. Compl. § II.C–D; Opp'n 12). Brooks claims that this incident caused him physical and emotional injuries, including two lumps on his back and chronic pain in his upper and lower back and neck. (*Id.* § III). He further alleges that he did not receive adequate medical attention for this incident or for the incident with Officer Jackson. (*Id.* § II.D). He also asserts that he has not received adequate mental health care at Attica. (Am.Compl.§ V).

**\*2** On or about April 23, 2009, Officer Jackson filed a misbehavior report against Brooks, alleging that Brooks stared at Officer Jackson through a mirror, exposed himself, and masturbated. (Opp'n 11, 33–36). Brooks contends that this incident never took place and that the misbehavior report defamed his character. (*Id.* at 11; Am. Compl. § II.D). A disciplinary hearing stemming from the allegations contained in the report was held on May 19, 2009. (Opp'n 33). Brooks alleges that at that hearing, Hearing Officer Carver violated his due process rights. (Opp'n 13, 33–35). In particular, he states that Officer Carver denied him the opportunity to call witnesses, failed to conduct an adequate mental health capacity assessment, and did not hold the hearing within fourteen days of the filing of the misbehavior report as required. (*Id.*). As a result of the hearing, Brooks was placed in keeplock, where he was allegedly held in an unsanitary cell

and denied food and showers. (Am. Compl. § II.D; Opp'n 14). Brooks also claims that on an unspecified date, some of his personal property, including books, family pictures, and letters, was destroyed. (Am.Compl.§ II.D). Finally, Brooks claims that Officers Carver and Jackson conspired to retaliate and discriminate against him. (*Id.* § II.D).

Brooks seeks $5,000,000 in damages to compensate for his physical and emotional injuries. (*Id.* § V). He also seeks to be transferred to Sing Sing to receive certain unspecified mental health treatment. (*Id.*).

### STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman,* 568 F.3d 329, 335 (2d Cir.2009). To survive a Rule 12(b)(6) motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

Plaintiff here is proceeding *pro se.* Accordingly, his submission must be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (stating that a court must "construe a *pro se* complaint liberally"). Nevertheless, *pro se* plaintiffs are not excused from the normal rules of pleading, and "dismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief." *Geldzahler v. N.Y. Med. Coll.,* 663 F.Supp.2d 379, 387 (S.D.N.Y.2009) (internal

quotation marks and alteration omitted). In other words, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.* (alteration in original) (internal quotation marks omitted).

**\*3** Generally, in considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), courts are limited to the facts alleged in the complaint and are required to accept these facts as true. *See, e.g., LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir.2009); *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See, e.g., Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152 (2d Cir.2013); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (applying rule to district courts). In addition, because a *pro se* plaintiff's allegations must be construed liberally, it is appropriate for a court to consider factual allegations made in a *pro se* plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint. *See, e.g., Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at \*1 (S.D.N.Y. Mar.18, 2010); *cf. Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a *pro se* plaintiff's affidavit in opposition to a motion to dismiss in addition to those in the complaint).

### DISCUSSION

Liberally construed, Brooks's Amended Complaint includes a veritable potpourri of claims against different combinations of Defendants, including claims under the Eighth Amendment, a claim of First Amendment retaliation, due process claims, defamation and defamation-type claims, conspiracy claims, and religious free exercise claims under both the First Amendment and RLUIPA. The moving Defendants (that is, all Defendants other than Officer Tomson, who has not appeared in this action) contend that each claim fails as a matter of law.[3] The Court will address each set of claims in turn.

### A. Eleventh Amendment Immunity

As an initial matter, Brooks has sued all individual Defendants in both their official and individual capacities, seeking both injunctive relief and monetary damages. (Am.Compl.1, § V). He also names DOCS as a defendant in his opposition papers. (Opp'n 15). It is well established that, absent abrogation by Congress, a state is immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54–56, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This sovereign immunity extends to "arms of the state," including agencies such as DOCS. *Morgan v. N.Y.S. Atty. Gen. Office,* No. 11 Civ. 9389(PKC), 2013 WL 491525, at *11 (S.D.N.Y. Feb.8, 2013); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Congress has not abrogated states' sovereign immunity with respect to claims brought under Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 340–42, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), nor has it done so with respect to claims brought under RLUIPA, *see Sossamon v. Texas,* —— U.S. ——, ——, 131 S.Ct. 1651, 1658, 179 L.Ed.2d 700 (2011). Further, a state officer may not be sued for damages in his official capacity under Section 1983 because he is not considered a "person" within the meaning of the statute. *See Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir.2012); *see also Koehl v. Dalsheim,* 85 F.3d 86, 88–89 (2d Cir.1996) (holding that a Section 1983 suit for money damages against a state official in his official capacity was barred by sovereign immunity). Thus, Brooks's claims against DOCS and his claims seeking monetary damages against the individual Defendants in their official capacities are dismissed with prejudice.

**B. Eighth Amendment Claims**

 **\*4** Section 1983 provides a civil cause of action against a person who, acting under the color of state law, deprives another person of any of the rights, privileges, or immunities secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010). Brooks's Amended Complaint, liberally construed, suggests four possible violations by Defendants of the Eighth Amendment's prohibition on cruel and unusual punishment. First, Brooks claims that, on or about April 17, 2009, Officer Jackson sexually and physically abused him during a pat-and-frisk. (Am.Compl.§§ II.A, III). Second, Brooks contends that, shortly thereafter, Officers McCurdy and Darden physically assaulted him. (Am.Compl.§ II.C). Third, Brooks's papers suggest an Eighth Amendment violation based on the alleged conditions of his

confinement while he was in keeplock. (Am. Compl. § II.D; Opp'n 14). Fourth, Brooks alleges that he did not receive adequate medical attention for the injuries he sustained from the assaults by Officers Jackson, McCurdy, and Darden, and that he has failed to receive adequate mental health treatment (Am. Compl. §§ II.D, III; Opp'n 11).

In order to successfully make out any Eighth Amendment claim, a prisoner must satisfy a two-part test, composed of an objective and subjective element. *See, e.g., Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012). Objectively, the conduct at issue, evaluated "in light of contemporary standards of decency," *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (internal quotation marks omitted), must be "sufficiently serious ... to reach constitutional dimensions," *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted). The subjective element requires the prison official accused of violating the Eighth Amendment to have possessed a "wanton state of mind" in carrying out the conduct at issue. *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (internal quotation marks omitted).

**1. The Pat–and–Frisk Incident with Officer Jackson**

Brooks alleges that, on April 17, 2009, Officer Jackson hit him in his groin, grabbed and pulled his genitals, and put her finger in his anus, resulting in severe pain to his groin, as well as emotional injuries. (Am.Compl.§ III). Liberally construed, these allegations raise an Eighth Amendment claim based on excessive force, where the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (internal quotation marks omitted); *accord Wright,* 554 F.3d at 268. Here, there is no indication that Officer Jackson's alleged use of force was for disciplinary purposes; Brooks alleges that she assaulted him for no particular reason. Such claims, if true, could indeed constitute a malicious and sadistic use of force, which would satisfy both the objective and subjective elements of the test. *See, e.g., Wright,* 554 F.3d at 268–69 ("[W]hen prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated." (internal quotation marks omitted)); *Sims v. Artuz,* 230 F.3d 14, 21–22 (2d Cir.2000) ("The malicious use of force to cause harm constitutes an Eighth Amendment violation *per se.*" (brackets omitted)).

Additionally, because Brooks alleges physical as well as emotional injury from this assault, he would be entitled to recover compensatory damages for both types of injury. *See Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that 42 U.S.C. § 1997e(e), which, in certain circumstances, bars prisoners from recovering from mental or emotional injuries, does not apply where there is a "showing of actual physical injury"). Defendants' motion to dismiss is therefore denied with regard to Officer Jackson's alleged assault.

### 2. The Assault by Officers McCurdy and Darden

**\*5** Brooks alleges that, later the same day, Officers McCurdy, Darden, and another unidentified individual assaulted him. (Am. Compl. § II.C; Opp'n 12). In particular, he alleges that Officer Darden first came to his cell and began to verbally harass him. (Opp'n 12.) He states that two more officers, including Officer McCurdy, then came to his cell and joined in the verbal harassment. (*Id.*) Brooks alleges that afterwards, while he was being escorted to the prison's mental health facility, the three officers who had been verbally harassing him approached him and punched him in the back of his head, neck, and back, while the officer who was escorting him walked away. (*Id.*) As a result of this assault, Brooks alleges, he developed permanent lumps on, and severe pain in, his back and neck. (Am.Compl.§ III).

These allegations also state an Eighth Amendment claim for excessive force. As discussed above, Eighth Amendment claims based on the excessive use of force turn on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins,* 559 U.S. at 37 (internal quotation marks omitted). As with the alleged incident with Officer Brooks, there is no indication that Officers Darden and McCurdy were using force for any disciplinary purposes; according to Brooks, they did so in response to Brooks "fucking with C.O. Jackson." (Opp'n 12). Brooks has pleaded sufficient facts to state a claim of use of excessive force by Officers McCurdy and Darden, and Defendants' motion to dismiss this claim is therefore also denied. Again, if proved true, Brooks would be entitled to recover for both his physical and emotional injuries stemming from this incident. *See Thompson,* 284 F.3d at 417.

### 3. Conditions of Confinement

Next, Brooks alleges that, while in keeplock, he was denied food trays, showers, and medical attention (Am.Compl.§ II.D), and was placed in a cell without a mattress, with a clogged toilet and sink, with a light bulb that blinked on and off, and with urine, feces, and blood on the floor. (Opp'n 14). As with any other Eighth Amendment claim, a conditions-of-confinement claim requires the prisoner to satisfy the objective and subjective prongs of the two-part test. In the conditions-of-confinement context, that means that "(1) objectively, the deprivation the inmate suffered [must have been] sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official [must have] acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (alteration and internal quotation marks omitted).

The conditions that Brooks alleges are arguably sufficiently serious to satisfy the objective prong of the Eighth Amendment analysis. *See id.* at 127 (noting that "unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment"); *Robles v. Coughlin,* 725 F.3d 12, 15 (2d Cir.1983) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."). Nevertheless, Brooks fails to allege deliberate indifference on the part of any moving Defendant. Deliberate indifference requires the prisoner to allege that the official "knows of and disregards an excessive risk to inmate health or safety." *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002). The only prison official alleged to have known of Brooks's conditions of confinement, however, is Officer Tomson (Am.Compl.§ II.D), and he has not appeared in this action. Accordingly, all of Brooks's Eighth Amendment conditions-of-confinement claims against the moving Defendants are dismissed.

### 4. The Denial of Medical Treatment

**\*6** Finally, Brooks claims that he did not receive adequate medical attention for the injuries he sustained from the sexual assault by Officer Jackson and the physical assault by Officers McCurdy and Darden. (Am.Compl.§ III). Liberally construed, his papers also suggest a claim that he has been denied adequate mental health care treatment. (Am. Compl. § II.D; Opp'n 11).

To establish an Eighth Amendment violation for inadequate medical care, a prisoner must make a showing of "deliberate indifference to his serious medical needs," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), which also involves a two-part objective and subjective test. The first, objective prong asks (1) whether the prisoner " 'was actually deprived of adequate medical care,' keeping in mind that only 'reasonable care' is required," and (2) " 'whether the inadequacy in medical care is sufficiently serious' by examining 'how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.' " *Sledge v. Fein,* No. 11 Civ. 7450(PKC), 2013 WL 1288183, at *5 (S.D.N.Y. Mar.28, 2013) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). The second, subjective prong requires the plaintiff to establish that the defendant acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280.

Here, Brooks's complaint lacks the detail necessary to establish a plausible deliberate indifference claim with respect to either his physical or mental health. Brooks alleges that he suffered chronic pain in his groin, neck, and back, and that the "[D]epartment of Correction[s] [was] not giving [him] the adequate medical attention [he] need[ed]." (Am.Comp. § III). Although a prisoner's chronic pain may be sufficiently serious to support an Eighth Amendment claim, *see Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003), Brooks fails to allege how the treatment he received was inadequate. Brooks admits that he was provided pain medication; he merely asserts, without elaboration, that this treatment was insufficient. (Am.Comp. § III). Such allegations do not give rise to a legal claim. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 504 (S.D.N.Y.2002) ("It is well established that a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Brooks does not explain why the pain medication he was provided was not satisfactory, what alternate treatment he would have preferred, or how such alternate treatment was necessary. With respect to the allegedly inadequate mental health care treatment, Brooks's papers are similarly devoid of any details regarding what mental illness afflicts him or

what type of treatment he requires. His claims regarding the denial of medical care are thus dismissed against all Defendants.

## C. First Amendment Retaliation Claim

 *7 As noted, Brooks claims that, as a result of his filing a grievance against Officer Jackson after the alleged sexual assault, Officers McCurdy, Darden, and another unidentified individual retaliated against him by assaulting, threatening, and harassing him. (Am.Compl.§§ II.C–D). He also suggests that Officer Jackson instructed them to do so. (Opp'n 12–13). Construed liberally, these facts are also sufficient to state a First Amendment retaliation claim.

To sustain such a claim, "a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks omitted). "The protected conduct must be 'a substantial or motivating factor for the adverse actions taken by prison officials.' " *Key v. Toussaint,* 660 F.Supp.2d 518, 525 (S.D.N.Y.2009) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003)). In light of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," courts must "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Consequently, "the plaintiff bears a heightened burden of proof." *Key,* 660 F.Supp.2d at 525 (internal quotation marks omitted).

Brooks's allegations satisfy all three elements required for a First Amendment retaliation claim. With respect to the first element, it is well established that the filing of a grievance is constitutionally protected behavior. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under [Section] 1983."). With respect to the second element, physical assault plainly constitutes adverse action, as it is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."

*Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003); *see, e.g., Varela v. Demmon,* 491 F.Supp.2d 442, 445, 450 (S.D.N.Y.2007) (noting the defendants' concession that a prisoner's allegation of assault by correction officers, if true, would meet the adverse action element of a retaliation claim).

Finally, Brooks adequately alleges a nexus between the protected speech and the alleged retaliatory action. In particular, Brooks claims that "C.O. Darden ... said she was going to kick my ass threat[en]ing to get me for C.O. K. Jackson" (Opp'n 12), and that "C.O. McC[u]rdy said he was going to fuck me up for fucking with C.O. K. Jackson." (*Id.*). He also alleges that Officer Tomson told him that Officer Jackson "inform[ed] her [co]workers to ret[al]iate against me." (*Id.*). These allegations (which are consistent with, even if slightly more detailed than, the allegations in the Amended Complaint) are sufficiently specific to survive even the heightened pleading standards for retaliation claims. Defendants' motion to dismiss the First Amendment retaliation claim against Officers McCurdy, Darden, and Jackson is therefore denied.

**D. Due Process Claims**

**\*8** Next, Brooks's papers raise two separate claims arising from the Due Process Clause of the Fourteenth Amendment. First, Brooks claims various procedural defects in his disciplinary hearing of May 19, 2009, including a denial of his right to call witnesses at the hearing, the failure of Officer Carver to conduct an adequate mental health capacity assessment, and the failure of Officer Carver to secure proper authorization to hold the hearing more than fourteen days after the misbehavior report was filed. (Opp'n 33–36). Second, Brooks claims that Officers Carver and Jackson destroyed certain items of his personal property, including books, family pictures, and letters. (Am. Compl § II.D).

"To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (brackets and internal quotation marks omitted). An inmate's liberty interest may be implicated when prison discipline "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (internal quotation marks omitted); *accord Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**1. The May 19, 2009 Disciplinary Hearing**
First, Brooks alleges that the procedures at the May 19, 2009 hearing, where he was accused of staring at Officer Jackson through his mirror, exposing himself, and masturbating, were constitutionally deficient. (Opp'n 33–36). In particular, Brooks contends that Officer Carver denied his request to call a correctional officer who was present at the site of the incident as a witness. (*Id.* 34). Brooks was found guilty at this disciplinary hearing and, as a consequence, was sent to keeplock for three months. (*Id.* 30). In keeplock, Brooks alleges he was denied food trays, showers, and medical attention (Am.Compl.§ II.D), and was placed in a cell without a mattress, with a clogged toilet and sink, with a light bulb that blinked on and off, and with urine, feces, and blood on the floor (Opp'n 14).

This claim is easily dismissed against all Defendants other than Officer Carver. It is a "prerequisite to an award of damages" under Section 1983 that any constitutional violations be tied to the "personal involvement of defendants in [the] alleged constitutional deprivations." *Spavone v. N.Y. State Dept. of Corr. Servs.,* 719 F.3d 127, 135 (2d Cir.2013) (internal quotation marks omitted). "[P]ersonal involvement of a ... defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant ... failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, ... (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [4] Brooks fails to allege that any Defendant other than Officer Carver was personally involved in the disciplinary hearing in any of these ways.

**\*9** The Court dismisses the due process claims against Officer Carver as well, but for a different reason: Brooks failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act (the "PLRA"), a prisoner must exhaust his administrative remedies before he can bring an action with respect to prison conditions. *See* 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 93–103, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In New York State, that means taking advantage of a three-tiered grievance procedure. *See, e.g., Bennett v. Wesley,* No. 11 Civ. 8715(JMF), 2013 WL 1798001,

at *4–5 (S.D.N.Y. Apr.29, 2013). In order to exhaust administrative remedies, a prisoner must complete all three tiers, up to and including an appeal to the Central Office Review Committee (the "CORC"). *See* 7 N.Y.C.R.R. § 701.5; *Bennett,* 2013 WL 1798001, at *4–5. The inmate must also comply with the agency's deadlines and other procedural rules. *See Woodford,* 548 U.S. at 93.

Although it may not be clear from the face of Brooks's Amended Complaint that he failed to exhaust his administrative remedies with respect to the due process claims against Officer Carver, the Court exercises its discretion to convert Defendants' motion to dismiss on this limited issue to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and thus considers materials beyond the scope of the pleadings. *See e.g., Williams v. Metro. Det. Ctr.,* 418 F.Supp.2d 96, 101–02 (E.D.N.Y.2005); *Rivera v. Pataki,* No. 01 Civ. 5179(MBM), 2003 WL 21511939, at *5 (S.D.N.Y. July 1, 2003). Conversion is proper because Defendants provided Brooks with notice that the Court might treat Defendants' motion to dismiss as a motion for summary judgment, and informed him that if he did not respond "by filing sworn affidavits and other papers as required by Rule 56(e)," his "COMPLAINT MAY BE DISMISSED." (*See* Docket No. 47). *See, e.g., Hernandez v. Coffey,* 582 F.3d 303, 308 n. 2 (2d Cir.2009) (citing cases finding that a Local Rule 12.1 Notice provides sufficient notice to pro se parties). Further, Brooks himself submitted evidence outside of the pleadings. (Opp'n 21–75). And converting Defendants' motion in this limited way "is likely to facilitate the disposition of the action" with respect to Officer Carver. *Stephens v. Bayview Nursing & Rehab. Ctr.,* No. 07 Civ 596(JFB)(AKT), 2008 WL 728896, at *2 (E.D.N.Y. Mar. 17, 2008) (internal quotation marks omitted). After all, the record makes clear that Officer Carver is entitled to judgment as a matter of law on the ground that Brooks failed to exhaust his administrative remedies. *See* Fed. R. Civ. P 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). [5]

In particular, the record makes clear that Brooks failed to appeal any grievance relating to his due process claim against Officer Carver to the CORC. The CORC, for example, has no record of any appeal by Brooks. (Hale Decl. ¶¶ 7–8 & Ex.A). And Brooks himself appears to concede in his opposition papers that he failed to appeal his grievances to the highest stage. (Opp'n 18–19). Brooks

does submit a copy of one grievance that appears to reflect an attempt to appeal to the CORC (Opp'n 52–53), but it did not satisfy the exhaustion requirement for several reasons. First, Brooks does not allege, let alone show, that he filed Form # 2133, which is required to properly file an appeal with the CORC. *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i) ("If the grievant or any direct party wishes to appeal to the CORC, he or she must complete and sign Form # 2133 and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance."). Second, the date of the appeal was more than one year after the alleged incident, so it was plainly untimely. *See id; see also* 7 N.Y.C.R.R. § 701.5(a)(1), (c) (setting out time limits in which inmates must file grievances to the lower tiers). Third and in any event, the grievance makes no mention of anything regarding Officer Carver's conduct at the disciplinary hearing.

**\*10** In short, the record shows that Brooks failed to exhaust his administrative remedies with respect to his due process claim against Officer Carver. Additionally, Brooks makes no allegations, and has submitted no evidence, with respect to Officer Carver that could support any exception to the administrative exhaustion requirement. *See supra* n. 3; *Bennett,* 2013 WL 1798001, at *6. Under the PLRA, therefore, Brooks's due process claim against Officer Carver must be dismissed for failure to exhaust. *See Bennett,* 2013 WL 1798001, at *5 (converting a motion to dismiss into a motion for summary judgment and dismissing on the ground that the plaintiff had failed to appeal to the CORC).

### 2. The Destruction of Personal Property

As noted, Brooks also alleges that certain of his personal property was destroyed, including song books, family pictures, letters, books, and legal documents. (Am.Compl.§ II.D). "An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has specifically held that the availability of an action in the New York Court of Claims constitutes such a remedy. *See, e.g., Davis v. New York,* 311 F. App'x 397, 401 (2d Cir.2009); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.2009); *see also Jones v. Harris,* 665 F.Supp.2d 384, 401 (S.D.N.Y.2009). As Brooks does not allege that he

is unable to file such an action, Defendants' motion to dismiss this claim is granted.

### E. Misbehavior Report

Next, Brooks claims that the misbehavior report filed against him by Officer Jackson on April 23, 2009, was fabricated. (Am.Compl.§ II.D). Read liberally, Brooks's papers allege that by filing this allegedly false report, Officer Jackson violated his constitutional rights and defamed his character. Both claims fail as a matter of law.

First, it is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.' " *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Thus, the only way in which the filing of a false misbehavior report can violate a prisoner's constitutional rights is if the report is filed in retaliation for the exercise of some other constitutional right, such as the filing of a grievance. *See Boddie,* 105 F.3d at 862*; see also Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."). Here, however, Brooks makes no claim that the filing of the misbehavior report was done in response to his filing of a grievance; in fact, at the disciplinary hearing, Brooks apparently testified that Jackson fabricated the allegations "for reasons unknown to [him]." (Opp'n 33). Therefore, Brooks's allegation that Officer Jackson filed a false misbehavior report against him is insufficient to state a claim for the violation of his constitutional rights.

**\*11**  Brooks's defamation claim also falls short. Generally speaking, state law, not Section 1983, provides the remedy for a defamation claim. *See, e.g., Lauro v. Charles,* 219 F.3d 202, 207 (2d Cir.2000). Federal constitutional relief may be available for defamation under the Due Process Clause—through what is known as a "stigma plus" claim—when a plaintiff can demonstrate that the government has (1) made an "utterance of a statement sufficiently derogatory to injure [the plaintiff's] reputation, that is capable of being proved false, and that [the plaintiff] claims is false," and (2) imposed a "material ... burden or ... alteration of the plaintiff's status or rights." *Vega v. Lantz,* 596 F.3d 77, 81 (2d Cir.2010) (internal quotation marks omitted). Further, the "statement must be sufficiently public to create or threaten a stigma." *Velez*

*v. Levy,* 401 F.3d 75, 87 (2d Cir.2005). Here, Brooks makes no allegations that Defendants (or anyone else) publicized the misbehavior report. It follows that his defamation claim must be dismissed.

### F. Conspiracy

Next, Brooks claims that Officers Carver and Jackson conspired together to unlawfully confine him, violate his mental health patient rights, retaliate against him, and discriminate against him. (Am.Compl.§ II.D). To establish a claim for conspiracy under Section 1983, Brooks must demonstrate "(1) an agreement between two or more state actors ... (2) to act in concert to inflict an unconstitutional injury; [and] (3) an overt act done in furtherance of that goal causing damages." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 507 (S.D.N.Y.2008) *aff'd sub nom. Jean–Laurent v. Wilkerson,* 461 F. App'x 18 (2d Cir.2012). "Because of the relative ease with which conspiracy allegations may be brought, and the substantial disruption of governmental function that they can cause, federal courts require 'more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive [the plaintiff] of his constitutional rights.' " *Nwanze v. Philip Morris Inc.,* 100 F.Supp.2d 215, 219 (S.D.N.Y.2000) (alteration in original) (quoting *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990)). To avoid dismissal, therefore, Brooks "must plead facts that show an agreement or some form of joint or concerted action." *Id.* (internal quotation marks omitted). Brooks must "make an effort to provide some details of time and place and the alleged effect of the conspiracy." *Id.* (internal quotation marks omitted).

Here, Brooks fails to allege any facts that might support an inference that Officers Jackson and Carver conspired to deprive him of his constitutional rights. Brooks makes only the conclusory allegation that "Carver work[ed] with K. Jackson" to unlawfully confine him, violate his mental health patient rights, destroy his personal property, and retaliate against him, but provides no other details to support his allegation of a conspiracy. (Am. Compl. § II . D). As Brooks has not pleaded facts that show an agreement or some form of joint or concerted action, Defendants' motion to dismiss this claim is granted.

### G. Religious Liberty Claims

**\*12**  Finally, liberally construed, Brooks's papers also allege a violation of his rights under both the Free Exercise

Clause of the First Amendment and RLUIPA. Brooks's papers suggest that he is a follower of the Muslim faith, and that being subjected to a pat-and-frisk by a member of the opposite sex violates his religious beliefs. (Am. Compl. § II.D; Opp'n 9). He alleges his rights were violated when Officer Jackson conducted two pat-and-frisks on him, at least one of which (and perhaps both of which) occurred after Brooks had informed her that he was Muslim and preferred to be frisked by an officer of the same sex. (Am. Compl. § II.D; Opp'n 9).

Brooks's RLUIPA claim is easily dismissed, as the Second Circuit recently held that the statute does not provide a private cause of action against state officials in their individual capacities (at least where, as here, there is no allegation that the officials' purported restriction on religious rights had an effect on interstate or foreign commerce). *See Washington v. Gonyea,* No. 11–980–cv, ––– F.3d ––––, 2013 WL 4792371, at *2–3 (2d Cir. Sept.10, 2013).

At this stage, however, the Court will not dismiss Brooks's Free Exercise claim. To assess a claim under the Free Exercise Clause, a court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (2) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). The first and the third elements are non-issues at this stage of the litigation. As to the first element, Brooks has alleged that he is a Muslim and thus prefers to be searched by male officers; the Court has no basis now to question the sincerity of these beliefs. (Am. Compl. § II.D; Opp'n 9). As to the third element, whether there is some legitimate penological objective served by cross-gender pat-and-frisks (or, more precisely, by not honoring an inmate's religious-based request to be frisked by an officer of the same gender) is not something that can be assessed on the current record.

Whether the allegations in the Amended Complaint are sufficient to satisfy the second element—that is, whether Brooks plausibly alleges that the disputed conduct "substantially burden[ed]" his "sincerely held religious beliefs," *Salahuddin,* 467 F.3d at 274–75—is a closer issue. Although the case law on point is limited, there is little question that cross-gender pat-and-frisks *can* substantially

burden a prisoner's Free Exercise rights. *See, e.g., Forde v. Baird,* 720 F.Supp.2d 170, 176 (D.Conn.2009); *Forde v. Zickefoose,* 612 F.Supp.2d 171, 175–78 (D.Conn.2009). But the line between what constitutes a substantial burden and what does not—and on which side of that line Brooks's allegations of two pat-and-frisk incidents would fall—is less clear. Given that lack of clarity, and mindful of Plaintiff's *pro se* status, the Court declines to hold that the allegations in the Amended Complaint fail as a matter of law. It would be more appropriate to address the issue, if ever, based on a more developed record.

## CONCLUSION

**\*13** For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. All of Brooks's claims against the moving Defendants (that is, all Defendants other than Officer Tomson) are dismissed except for (1) his Eighth Amendment claim against Officer Jackson in her individual capacity relating to the April 17, 2009 incident; (2) his Eighth Amendment claim against Officers Darden and McCurdy in their individual capacities relating to the alleged assault around that same date; (3) his First Amendment retaliation claim against Officers Jackson, McCurdy, and Darden in their individual capacities; and (4) his First Amendment Free Exercise claim against Officer Jackson in her individual capacity.

As noted, Officer Tomson has not appeared in this action. Because Officer Tomson was not served within 120 days of the filing of the Complaint, it is hereby ORDERED that Brooks show cause in writing as to why he has failed to serve the summons and Complaint within the 120 days prescribed by Rule 4(m) of the Federal Rules of Civil Procedure or, if Brooks believes that Office Tomson has been served, that he submit a letter to the Court stating when and in what manner such service was made. If the Court does not receive any communication from Brooks within **thirty days,** showing good cause why such service was not timely made, the Court will dismiss the case against Officer Tomson.

**The Clerk of Court is directed to terminate as parties Officer Carver and all other Defendants to the extent they have been sued in their official capacities, to terminate Docket No. 44, and to mail a copy of this Memorandum Opinion and Order to Plaintiff.**

This Court certifies, pursuant to Title 28, United States Code, Section 1915(a)(3), that any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is thus denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5339151

Footnotes

1    Brooks also names Correctional Officer Tomson as a Defendant in the Amended Complaint, but there is no record that he has served Tomson.

2    At one point in his original Complaint, Brooks identifies the date as May 17, 2009. (Compl. § III (Docket No. 2)).

3    Defendants also argue that Brooks's claims should be dismissed for failure to exhaust administrative remedies. (Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. 5–7 (Docket No. 45); Hale Decl. ¶¶ 7–8 & Ex.A (Docket No. 46)). The failure to exhaust is an affirmative defense, however, which may be raised on a motion to dismiss only where the defense "appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998). Because it is not clear from the face of Brooks's Amended Complaint that he failed to exhaust his administrative remedies, and because Brooks plausibly alleges that at least some Defendants—namely, Officers Jackson, McCurdy, and Darden—engaged in conduct that may estop them from raising the defense of nonexhaustion, *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (holding defendants may be estopped from arguing non-exhaustion when "[their] own actions inhibit[ ] the inmate's exhaustion of remedies"), the Court concludes that dismissal on this basis is not warranted at this stage. As discussed below, however, the Court converts Defendants' motion to dismiss for failure to exhaust to a motion for summary judgment with respect to the due process claim asserted against Officer Carver, and dismisses that one claim under the summary judgment standard.

4    Although there is some uncertainty with respect to whether, or to what extent, the *Colon* categories remain good law following the Supreme Court's decision in *Iqbal, see, e.g., Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *9 (S.D.N.Y. Apr.5, 2013), the Court need not address that issue in this case.

5    The Court notes that, at least in some cases, courts in the Second Circuit have considered administrative records in the exhaustion context on a motion to dismiss without converting the motion to one for summary judgment. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 637–38 (S.D.N.Y.2006), *on reconsideration in part,* 04 CIV. 8850 RWS, 2008 WL 591230 (S.D.N.Y. Mar.3, 2008); *Abney v. McGinnis,* No. 01 Civ. 8444(SAS), 2002 WL 1461491, *3–4, 2002 U.S. Dist. LEXIS 12180, at *6–7 (S.D.N.Y. July 2, 2002), *reversed and vacated on other grounds,* 380 F.3d 663 (2d Cir.2004). Here, however, because Plaintiff was on notice that Defendants' motion might be converted to one for summary judgment, and because Plaintiff himself submitted extrinsic materials with his Opposition Memorandum, the Court finds it appropriate to convert this motion to one for summary judgment, at least for this limited purpose.

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 3286353
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Isidro ABASCAL, Plaintiff,
v.
Dennis FLECKENSTEIN, William Kump,
Chester Kosmowski, James T. Conway,
and Thomas G. Eagen, Defendants.

No. 06-CV-349S.
|
Aug. 7, 2008.

**Attorneys and Law Firms**

Isidro Abascal, New York, NY, pro se.

George Michael Zimmermann, Office of the New York
State Attorney General, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, District Judge.

**I. INTRODUCTION**

*1 In this action, pro se Plaintiff Isidro Abascal alleges
pursuant to 42 U.S.C. § 1983 that Defendants subjected
him to cruel and unusual punishment and failed to protect
him in violation of the Eighth Amendment.

Plaintiff commenced this action on May 26, 2006, by
filing a Complaint in the United States District Court
for the Western District of New York. Because Plaintiff
was granted *in forma pauperis* status, his Complaint
was screened pursuant to 28 U.S.C. §§ 1915(e)(2)(B)
and 1915A(a). Presently before this Court is Defendants'
Motion to Dismiss all but one of Plaintiff's causes of
action, filed on April 6, 2007. [1] For the following reasons,
Defendants' motion is granted in part and denied in part.

**II. BACKGROUND**

The following facts, which are alleged in the Complaint,
are assumed to be true for purposes of the instant
motion. At all times relevant, Plaintiff was an inmate
in the custody of the New York Department of
Correctional Services ("DOCS") incarcerated at the
Attica Correctional Facility. (Complaint, Docket No. 1,
pp. 1-2). [2] Plaintiff is now on parole. (Complaint, p. 1).

Plaintiff alleges that while incarcerated, he was deprived
of meals, deprived of electricity in his cell, his
legal documents were taken from him and read,
he was physically assaulted, and he was verbally
threatened. At all times relevant, Defendants Dennis
Fleckenstein, William Kump, and Chester Kosmowski,
were correctional officers ("CO" ') at Attica. (Complaint,
pp. 1-2).

Plaintiff alleges that Fleckenstein, Kump, and Kosmowski
deprived him of meals. [3] On September 18, 2004, Kump
allegedly refused to open Plaintiff's cell to allow him to
report for chow (meal time). (Complaint, p. 4, ¶ 15).
On fourteen additional occasions beginning in December
2004 and ending in March 2005, Fleckenstein also
allegedly refused to open Plaintiff's cell so that he could
report for chow. (Complaint, pp. 4-6). Plaintiff further
alleges that Kump was involved in two of these thirteen
instances and Kosmowski was involved in five of the
instances. (Complaint, pp. 5-6, ¶¶ 28-32, 34, 36).

For example, on February 21, 2005, while Plaintiff was
waiting to go to chow, Kosmowski told him that he was
going to be fed in his cell instead. (Complaint, p. 5, ¶ 22).
Plaintiff was then given two milk cartons, one small apple
juice container, and a bag with six small bags of sugar.
(Complaint, p. 5, ¶ 22). When Plaintiff later inquired
about the food he received, Fleckenstein told him that the
"feed-up personnel" had screwed up. (Complaint, p. 5, ¶
22).

Finally, Plaintiff alleges that he missed seven of twelve
meals in the 4-day period between March 3 and March 6,
2005. (Complaint, p. 6, ¶¶ 30-34, 36-38).

Plaintiff's deprivation of electricity claims involve
Fleckenstein and Kosmowksi. They allegedly turned off
the power in Plaintiff's cell on February 27, 2005, at
approximately 12:30 p.m. (Complaint, p. 5, ¶ 28). Plaintiff
further alleges that on March 5, 2005, Fleckenstein turned

off the power in his cell after he saw him using his typewriter. (Complaint, p. 6, ¶ 35).

**\*2** Plaintiff also alleges that his legal documents were taken from him and read. On November 13, 2004, Kump and Fleckenstein allegedly stopped Plaintiff in the entrance of the law library to search his legal folder. (Complaint, p. 4, ¶ 16). Kump allegedly read Plaintiff's legal papers and notes, and asked Plaintiff if he was going to sue the state for something that happened while he was DOCS' custody. (Complaint, p. 4, ¶ 16). Plaintiff responded that he was not required to answer. (Complaint, p. 4, ¶ 16). Further, at 12:30 p.m. on January 18, 2005, when Plaintiff returned from chow, he saw his legal documents (civil rights amended complaint) on the CO's desk 240 feet from his cell. (Complaint, p. 4, ¶ 20). After he requested the return of his documents, Plaintiff proceeded to his cell, which had been searched. (Complaint, p. 4, ¶ 20). Five minutes later, Kump returned the documents to Plaintiff and gave him a search receipt. (Complaint, p. 4, ¶ 20).

Plaintiff's physical assault claims are against Fleckenstein and Kosmowski. Plaintiff alleges that Fleckenstein physically assaulted him, and that Kosmowski witnessed the incident, but did nothing to stop Fleckenstein or help Plaintiff. On February 22, 2005, at approximately 9:50 a.m., Fleckenstein allegedly elbowed Plaintiff in his right rib cage without provocation while on the way to a sick-call. [4] (Complaint, p. 5, ¶ 24). Plaintiff did not resist or threaten Fleckenstein, but told him that he was going to report the assault. (Complaint, p. 5, ¶ 24). At approximately 10:15 a.m ., when Plaintiff returned from sick call, he reported the assault to the Hall Captain and told him to report it to the Block Sergeant. (Complaint, p. 5, ¶ 24).

Plaintiff further alleges that on the same day at approximately 10:25 a.m., Kosmowski asked Plaintiff why he bumped his partner in reference to the physical incident with Fleckenstein earlier that day. (Complaint, p. 5, ¶ 26). Plaintiff denied bumping Fleckenstein, but Kosmowski responded that he saw Plaintiff bump him. (Complaint, p. 5, ¶ 26). Plaintiff told Kosmowski that he was part of a conspiracy. (Complaint, p. 5, ¶ 26).

Plaintiff also alleges several instances where Fleckenstein or Kump verbally threatened him. On February 21, 2005, after Plaintiff complained about being fed in his cell, Fleckenstein approached Plaintiff's cell with an intimidating look and told him twice, "You better watch your step!" (Complaint, p. 5, ¶ 22). On November 13, 2004, when Plaintiff's legal folder was searched, Kump also allegedly told Plaintiff, "Get out of here before I slap the shit out of you to give you a reason to sue the state!" (Complaint, p. 4, ¶ 16). Fleckenstein, who was present when Plaintiff reported the physical incident of February 22, 2005, told Plaintiff, "The next time, I'm going to wrap you up in a bag!" (Complaint, p. 5, ¶ 25). On March 4, 2005, at approximately 11:50 a.m., Fleckenstein allegedly made a fist near Plaintiff's face and said, "We're going to pound you!" and "We're going to stop your bullshit!" (Complaint, p. 6, ¶ 33).

**\*3** Finally, Plaintiff alleges that Conway and Eagen failed to protect him from a known pattern of abuse, despite being informed of the conditions in writing. (Complaint, pp. 8-9). At all times relevant, Defendant James Conway was the Superintendent at Attica, and Defendant Thomas Eagen was the Director of the Inmate Grievance Program in the DOCS. (Complaint, pp. 1-2). On January 7, February 16, and March 17, 2005, Plaintiff appealed Conway's unfavorable decisions regarding three harassment and retaliation grievances that he had filed on December 3, 2004, January 29, 2005, and February 24, 2005. (Complaint, pp. 4-6, ¶¶ 19, 21, 39). Eagen denied the appeals on February 9, March 23, and April 20, 2005. (Complaint, pp. 4-6, ¶¶ 19, 21, 39).

### III. DISCUSSION

Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally, and interpret them to raise the strongest arguments they suggest. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Since Plaintiff is proceeding pro se, this Court has considered his submissions and arguments accordingly.

Plaintiff alleges that Defendants' subjected him to cruel and unusual punishment in violation of the Eighth Amendment. He further alleges that Defendants Conway and Eagen violated his constitutional rights by failing to protect him. Defendants argue that all causes of action, except the claim of excessive force against Fleckenstein, should be dismissed for failure to state a claim upon

which relief can be granted or for insufficient pleading. In addition, Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment and should therefore be dismissed. The parties' respective positions are further discussed below.

### A. Motion to Dismiss Standard

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When determining whether a complaint states a claim, the court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008). Although the complaint need not include detailed factual allegations, the plaintiff must show the "grounds of his entitlement to relief." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----,127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.; Goldstein,* 516 F.3d at 56. But the Second Circuit does not interpret *Twombly* as "requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-158 (2d Cir.2007) (emphasis in original).

 **\*4** Federal pleading standards are generally not stringent. *See Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir.2005) (describing federal pleading requirement as "bare bones notice pleading"); *Phillip v. Univ. of Rochester,* 316 F.3d 291, 293 (2d Cir.2003) ("The federal rules allow simple pleadings and rely on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." (quotation and citation omitted)). Rule 8(a) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, it is necessary "that the plain statement possess enough heft to show that the pleader is entitled to relief." *Twombly,* 127 S.Ct. at 1966.

In the context of pro se actions, the United States Supreme Court has rejected the idea that the plausibility standard requires amplification with factual allegations to render

the claim plausible. *See Erickson v. Pardus,* ---U.S. ----, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). In *Erickson,* the Supreme Court reversed the "dismissal of a prisoner's Eighth Amendment claim, holding the court of appeals had 'depart[ed]' from the liberal pleading standards of Rule 8(a)." *Boykin v. KeyCorp,* 521 F.3d at 214 (2d Cir.2008) (quoting *Erickson,* 127 S.Ct. at 2200). Although the Court did not clarify when the plausibility standard requires factual amplification, it noted that "a *pro se* complaint however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson,* 127 S.Ct. at 2200 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

### B. 42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. *See* 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. *See Graham v. Connor,* 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. *See Baker,* 443 U.S. at 140. Here, Plaintiff's various § 1983 claims are grounded in the Eighth Amendment.

#### 1. Deprivation of Food

Plaintiff alleges that Defendants Fleckenstein, Kump, and Kosmowksi deprived him of food on several occasions. Defendants argue that Plaintiff's allegations fail to state a claim upon which relief can be granted. They argue that only three of the alleged instances should be considered, and that these do not rise to the level of a constitutional violation. (Defendants' Memorandum, Docket No. 16, pp. 6-9).

 **\*5** The Prison Litigation Reform Act ("PLRA") requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U .S.C. § 1997e(a). Defendants argue that Plaintiff failed to exhaust his administrative remedies because twelve of the fifteen instances were mentioned only in the appeals of his grievances, not in the initial grievances. (Defendants' Memorandum, p. 7). But the record reflects that in Plaintiff's initial grievances on January 7 and March 17, 2005, he alleged specific instances of food deprivation and that he had "been subjected to the inhumane prison practice of being deprived of his food innumerable times." (Complaint, p. 27). This Court therefore finds, at this stage, that Plaintiff has adequately pled that he exhausted his administrative remedies. All fifteen occasions will therefore be considered.

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991) (quoting U.S. CONST. amend. VIII). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment...." Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993) (quoting DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989)).

Plaintiff's Eighth Amendment cruel and unusual punishment claim is evaluated under a two-prong inquiry. Wilson v. Seiter, 501 U.S. 294, 297-298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). To meet the objective prong, the alleged violation must be "sufficiently serious" by objective standards. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (citing Wilson, 501 U.S. at 298). The violation will be considered sufficiently serious if the penalty is grossly disproportionate or denied the inmate the "minimal civilized measure of life's necessities." See Williams v. Couglin, 875 F.Supp. 1004 (W.D.N.Y.1995) (quoting Wilson, 501 U.S. at 298). To satisfy the subjective inquiry

the plaintiff must show that the officials acted with deliberate indifference. Farmer, 511 U.S. at 837.

**\*6** "The Second Circuit has noted that while no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Williams, 875 F.Supp. at 1010 (quotation and citation omitted). Withholding of food for two or more days has been considered a sufficiently serious violation to state an Eighth Amendment claim. Williams, 875 F.Supp. at 1013. Further, withholding of food may be considered a sufficiently serious violation when used as a punishment, if it is grossly disproportionate to the offense. See Williams, 875 F.Supp. at 1013; Moss v. Ward, 450 F.Supp. 591, 596 (W.D.N.Y.1978).

In this Court's view, Plaintiff's allegation that Fleckenstein deprived him of twelve meals between February 22 and March 6, 2005, (at one point seven meals over a four-day period), if proven, is sufficiently serious such that it could constitute the denial of the minimal civilized measure of life's necessities. Moreover, Kosmowski is alleged to have deprived Plaintiff of food five times within one week, which is sufficiently serious to state an Eighth Amendment claim. Under the circumstances, it is also possible that a jury could find that Fleckenstein and Kosmowski acted with deliberate indifference. Accordingly, accepting Plaintiff's allegations as true, this Court finds that he has adequately stated a claim upon which relief can be granted, and Defendants' motion to dismiss the claims against Fleckenstein and Kosmowski is denied.

But as for Plaintiff's food deprivation claims against Kump, this Court finds that Kump's alleged involvement in three incidents of food deprivation between September 18, 2004, and March 3, 2005, is not a sufficiently serious violation to state an Eighth Amendment claim because even if they occurred, these were isolated, single-meal deprivations. Cf. Williams, 875 F.Supp. at 1013 (withholding food for two or more days is sufficiently serious). Accordingly, Defendants' motion to dismiss the claim against Kump will be granted.

### 2. Deprivation of Power in Cell
Plaintiff alleges that Defendants Fleckenstein and Kosmowksi deprived him of electricity in his cell on two occasions. He alleges that the electricity was off for

approximately two hours during the first incident, and one hour during the second. (Plaintiff's Memorandum, Docket No. 18, p. 13). Defendants argue that Plaintiff's allegations fail to state a claim upon which relief can be granted.

Deprivation of electricity can form the basis of an Eighth Amendment conditions-ofconfinement claim. *Cf. Powell v. Beilien,* No. 04-CV-0926, 2005 WL 1000040, at *2 (W.D.N.Y. Apr. 25, 2005). To establish a violation, an inmate must show "(1) that the deprivation alleged is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and (2) that the defendant official possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain." *Trammell v. Keane,* 338, F.3d 55, 161 (2d Cir.2003) (citing *Farmer,* 511 U.S. at 834 (internal quotation omitted)). In this court's view, even assuming the truth of Plaintiff's claim that the power in his cell was briefly turned off on two occasions, this de minimus deprivation is not objectively sufficiently serious to state a claim under the Eighth Amendment, particularly here, where Plaintiff has not alleged that he suffered any injury as a result of he brief loss of electricity.

*7 To the extent Plaintiff claims that the power being turned off in his cell resulted in inadequate lighting (as stated in Plaintiff's reply to Defendant's Motion to Dismiss, Plaintiff's Memorandum, p. 13), this too fails to state a claim. To allege a claim of inadequate lighting "an inmate must allege that the lighting was so inadequate that it cause or aggravated an objectively serious medical condition and that the defendant was deliberately indifferent to the medical condition." *Powell,* 2005 WL 1000040, at *2. No such allegations are made in the Complaint. Plaintiff therefore fails to state an Eighth Amendment violation based on inadequate lighting.

Accordingly, Plaintiff's Eighth Amendment claims based on deprivation of electricity and inadequate lighting will be dismissed.

### 3. Taking and Reading Legal Documents

Plaintiff maintains that Defendant Kump violated his constitutional rights by taking his legal documents from his cell and reading them. In Plaintiff's Memorandum in Opposition to the Defendant's Motion to Dismiss, Plaintiff specifically states that he is not asserting a claim for denial of access to courts. (Docket No. 18, p. 11).

Defendants assert that Plaintiff has not stated a claim upon which relief can be granted.

"There are numerous cases holding that ... allegations regarding intentional confiscation or destruction of a prisoner's property without justification or explanation state a § 1983 claim, [a]nd there are also cases protecting a prisoner's right to access to the courts and to privacy in legal correspondence." *Bayron v. Trudeau,* 702 F.2d 43 (2d Cir.1983) (holding that the district court erred in dismissing inmate's claims that he was intentionally deprived of property and that his legal papers were read by an officer). Plaintiff alleges that his legal property was confiscated, held, and read without justification. Accordingly, he has adequately stated a claim upon which relief can be granted, and Defendants' motion to dismiss is therefore denied.

### 4. Verbal Threats

Plaintiff argues that Defendants Fleckenstein and Kump violated his Eighth Amendment rights by verbally threatening him. "Verbal threats and harassment alone are not actionable under Section 1983." *Murray v. Kirkpatric,* 06-CV-598SR, 2007 WL 541986, at *4 (W.D.N.Y. Feb.13, 2007). To the extent Plaintiff bases his claim solely on verbal threats, he has failed to state a claim upon which relief can be granted.

Reading the Complaint liberally, Plaintiff may be alleging that when Kump told Plaintiff to "[g]et out of here before I ... give you a reason to sue the state," he was retaliating against him for researching and drafting a legal complaint. (Complaint, p. 4, ¶ 16). To survive a motion to dismiss on a retaliation claim, the prisoner must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchack,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). For purposes of the second requirement, adverse action is defined as one "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 380; *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "If the action would not deter an individual of ordinary firmness the retaliatory act 'is simply de minimis and therefore outside the ambit of constitutional protection.'"

*Islam v. Goord,* No. 05 Civ. 7502, 2006 WL 2819651, at *4 (S.D.N.Y. Sept.29, 2006) (citing *Davis,* 320 F.3d at 353).

**\*8** Plaintiff undisputedly has a constitutionally-protected right of access to courts, which requires prison authorities to assist in the preparation and filing of meaningful legal papers. U.S. CONST. amend. VIII; 42 U.S.C. § 1983; *Bounds,* 430 U.S. at 821, 828. However, Plaintiff has not alleged that Defendants took adverse action against him. Kump's alleged verbal threat is indistinguishable from those that have been found insufficient to establish a constitutional violation. *See, e.g., Bartley v. Collins,* 95 Civ. 10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action"); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D .N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff's claims ... were intended to incite the inmates to harm plaintiff ... do not rise to a retaliation claim").

Here, Plaintiff does not allege that Kump's threats resulted in any further action or injury. Accordingly, even liberally construing the Complaint to include a retaliation claim, it must be dismissed. *See Dawes,* 239 F.3d at 491 (courts must approach retaliation claims "with skepticism and particular care," because 'virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionallyact").

### 5. Conspiracy

Plaintiff alleges that Kosmowksi participated in a conspiracy with Fleckenstein to violate his Eighth Amendment rights by subjecting him to excessive force. Defendants argue that Plaintiff has not sufficiently alleged a conspiracy because his claim is unsupported, speculative, and conclusory. (Defendants' Memorandum, p. 15). According to Defendants, Plaintiff merely describes the actions the defendants took, and claims this is the evidence of the conspiracy. To allege a conspiracy, a "plaintiff must allege facts which establish an agreement among the defendants," however, "conclusory, vague or general allegations of conspiracy cannot withstand a motion to dismiss." *Eleby v. Simmons,* No. 02 CV 636, 2004 WL 1574062, at *1 (W.D.N.Y. June 21, 2004); *see also Boddie v. Schneider,* 105 F.3d 857, 863 (2d Cir.1997) (dismissing an inmate's conspiracy allegations as too general and conclusory). In support of his claim, Plaintiff

simply describes Kosmowski's actions as evidence of a conspiracy. In this Court's view, Plaintiff's allegations are too vague and general to sufficiently plead a conspiracy, and therefore must be dismissed.

If the incident gives rise to any claim against Kosmowski, it is for failure to intervene. A law enforcement official has an affirmative duty to intervene on behalf of a citizen whose constitutional rights are being violated in his presence by other officers. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001). The official may be liable if he observes the use of excessive force or has reason to know that it will be used, and has a realistic opportunity to intervene to prevent the harm from occurring. *Curley,* 268 F.3d at 72; *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

**\*9** Plaintiff asserts that Kosmowski was present at the physical incident between Plaintiff and Fleckenstein, but did not intervene. Instead, Kosmowski allegedly made comments to Plaintiff after the incident that he saw Plaintiff bump Fleckenstein. Although Defendants argue that Plaintiff has not sufficiently pleaded this claim, this Court finds that a liberal construction of Plaintiff's Complaint and submissions reveals that Plaintiff has adequately pleaded a failure-to-intervene claim against Kosmowski. Defendants' motion to dismiss this claim will therefore be denied.

### 6. Failure to Protect

Plaintiff alleges that Defendants Conway and Eagen failed to protect him. Defendants argue that Plaintiff has not sufficiently alleged failure to protect in his Complaint.

Among other things, the Eighth Amendment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). To state a failure-to-protect claim under § 1983, the plaintiff must establish two conditions: "First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed [the] sufficient culpable intent" of deliberate indifference. *Hayes v. New York City Dep't of Corrs.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 837). The test for deliberate indifference is twofold: the official must have knowledge that an inmate faces a

substantial risk of harm, or be aware of facts from which he has drawn such an inference, and disregards the risk by failing to take measures to abate the risk. *See Farmer,* 511 U.S. at 847; *Hayes,* 84 F.3d at 620; *Warren v. Goord,* 476 F.Supp.2d 407 (S.D.N.Y.2007).

Plaintiff argues that Conway and Eagen were deliberately indifferent because they were aware that he faced a substantial risk of harm from his IGC's, and they failed to abate the harm by denying the grievances. In support of this argument, Plaintiff relies on his allegations that Conway denied his grievances, and that Eagen denied his appeals. But the denial of a grievance, without further explanation of how the denial violated a constitutional right, is an insufficient basis upon which to state a claim. *See Warren,* 476 F.Supp.2d at 413. Further, "liability cannot be imposed on a state official for damages under § 1983 solely by the fact that he is a supervisor because respondeat superior liability does not exist under § 1983." *Abbas v. Senkowski,* No. 03 Civ. 476, 2005 WL 2179426 at *2 (N.D.N.Y. Sept. 9, 2005) (citing *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999)). In the present case, Plaintiff has not included any allegations concerning how Defendants' denial of his administrative appeals gives rise to a plausible failure to protect claim. As such, Plaintiff has failed to allege a claim for failure to protect against Conway or Eagen; they will therefore be dismissed from this case.

### C. Qualified Immunity

**\*10** Plaintiff's claims are asserted against Defendants in their individual and official capacities. The claims against Defendants in their official capacities are barred by the Eleventh Amendment and should be dismissed. *See* U.S. CONST. amend. XI; *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Eleventh Amendment renders states immune from suit in federal court and "this immunity extends to state agencies, state branches of government, and other arms of the state." *Guarneri v. West,* 518 F.Supp.2d 514, 519 (W.D.N.Y.2007). DOCS, as a state agency, enjoys Eleventh Amendment immunity from suit in federal

court. *Guarneri,* 518 F.Supp.2d at 519. Claims against state officials in their official capacities are considered claims against the state and are therefore barred by the Eleventh Amendment. *Guarneri,* 518 F.Supp.2d at 519. Accordingly, Defendants' motion to dismiss Plaintiff's claims against Defendants in their official capacities will be granted.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. The motion is granted with respect to the claim of food deprivation against Kump; the deprivation of electricity claim against Fleckenstein and Kosmowski; the verbal threat and retaliation claims against Fleckenstein and Kump; the conspiracy claim against Kosmowski; the failure-to-protect claims against Conway and Eagen; and all claims asserted against the Defendants in their official capacities. The motion is denied with respect to the food deprivation claims against Fleckenstein and Kosmowski; the claim that Kump took and read Plaintiff's legal documents; and the failure-to-intervene claim against Kosmowski.

### V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 15) is GRANTED in part and DENIED in part consistent with this decision.

FURTHER, that the Clerk of the Court is directed to terminate Defendants Conway and Eagen as defendants in this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 3286353

### Footnotes

1   In support of their Motion to Dismiss, Defendants filed a Memorandum of Law and a Reply Memorandum of Law (Docket Nos. 16, 22). In response, Plaintiff filed a Memorandum of Law, an Affidavit in Opposition to the Motion to Dismiss, and a Statement of Disputed Factual Issues of Material Facts and Appendix (Docket Nos. 18, 19, 20, 21).

2   Plaintiff's Complaint and the three exhibits attached to it are consecutively numbered as a single document.

3    Plaintiff also alleges other violations involving a number of COs at Attica, none of whom are named as defendants. The alleged incidents occurred on November 30 and December 24, 2003; January 7 and 13, March 9, April 23 and 27, May 29, June 11 and 28, July 20, August 12 and 27, September 18, 2004; and March 28, 2005.

4    Defendants have not moved to dismiss the claim for excessive force regarding this incident against Fleckenstein.

**End of Document**       © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,
v.
Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).
|
Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility,
Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York,
Of Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

 **\*1** Plaintiff, Ulysses Williams ("Williams" or
"plaintiff"), proceeding *pro se,* is currently an inmate at
Orleans Correctional Facility in Albion, New York. From
late 1997 until early 1998, the time period relevant for this
lawsuit, plaintiff was incarcerated at Fishkill Correctional
Facility ("Fishkill"). On December 12, 1997, plaintiff filed
a grievance alleging that Officer C. Madura ("Madura")
and Officer Robert Muller ("Muller" or "defendant")
"spread malicious rumors to the inmate population that
[plaintiff] was illegally selling Inmate Liaison Committee
("ILC") supplies" in retaliation against prior grievances
that plaintiff had allegedly filed against the officers. *See*
Ex. A. On January 15, 1998, the Superintendent of the
Inmate Grievance Program denied plaintiff's grievance
seeking suspension of the two officers.

Plaintiff's complaint in this action, dated February
20, 1998, reasserts his December 12, 1997 retaliation
claim against Muller, pursuant to 42 U.S.C. § 1983. In
addition, plaintiff complains of a second act of retaliation
under § 1983 by Muller, allegedly made in response to
plaintiff's filing of the December 12, 1997 grievance. On
January 9, 2001, Muller moved for summary judgment
pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure. Because plaintiff has failed to establish either
of his retaliation claims, defendant's motion for summary
judgment is granted in its entirety. [1]

*FACTS*

On December 12, 1997, plaintiff filed a grievance against
correction officers Madura and Muller, alleging that
they had spread rumors that plaintiff had been illegally
selling supplies from the ILC—an inmate organization
within the facility—to other inmates. *See* Ex. A.
Furthermore, plaintiff claims that he "encountered several
confrontations with other inmates due to such rumors; in
which could have ended in physical conflict." *See* Pl.'s Aff.
at 7. Plaintiff alleges that defendant spread such rumors
with the intention of provoking such "confrontations." *Id.*
Plaintiff does not deny that he was found in possession of
ILC supplies, but he alleges that he was in charge of issuing
such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill ruled
that plaintiff's grievance was baseless. *See* Ex. A. The
Superintendent stated that prison officials had found
"excessive ILC supplies" in plaintiff's locker. *Id.* Plaintiff
appealed the Superintendent's findings, and on January
28, 1998, the New York State Department of Correctional
Services ("DOCS") Central Office Review Committee
("CORC") upheld the Superintendent's denial of the
grievance.

Plaintiff alleges that a little over a month after he filed the
December 12, 1997 grievance, Muller retaliated against
him by filing a meritless Inmate Misbehavior Report. *See*
Ex. F. Muller contends that on January 14, 1998, while
stationed on the stairwell of Fishkill's A–Floor monitoring
inmate traffic, he questioned plaintiff as to the contents of
the bag which plaintiff was carrying. Allegedly, plaintiff
refused to answer his questions. Furthermore, Muller
contends that plaintiff yelled at him. According to
defendant, this confrontation blocked inmate traffic in the
hallway for fifteen minutes. *See* Ex. G. Muller alleges that
he gave plaintiff a direct order to step to the side and
to stop yelling. Plaintiff allegedly refused to do so and
demanded to see a sergeant "right now." A sergeant was
notified and plaintiff was escorted to the Special Housing
Unit ("SHU"). *Id.*

 **\*2** In his deposition, plaintiff denied all allegations
that he behaved inappropriately. As a result of plaintiff's

alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under [28 U.S.C.1915(a)](#) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under [28 U.S.C.1915(d)](#) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, [42 U.S.C. § 1997e(a)](#). *See Williams v. Muller,* [2000 WL 487954 at *3 (S.D.N.Y. Apr. 25, 2000)](#). Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating [§ 1983](#) claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Fed.R.Civ.P. 56(c)](#). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* [477 U.S. 317, 325 (1986)](#). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." [Fed.R.Civ.P. 56(e)](#); *Williams v. Smith,* [781 F.2d 319, 323 (2d Cir.1986)](#). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* [475 U.S. 574, 586–87 (1986)](#). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* [781 F.2d at 323](#).

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* [58 F.3d 865, 872 (2d Cir.1995)](#). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* [89 F.3d 75, 79 (2d Cir.1996)](#) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* [89 F.Supp.2d 475, 477 (2d Cir.2000)](#). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* [2000 WL 1855128 at *3 (S.D.N.Y. Dec.](#)

19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

*DISCUSSION*

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*
Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes,* 239 F.3d at 492; *see also Graham,* 89 F .3d at 80. The retaliatory

action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*
Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. E, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation. [4] *See* Ex. H at 127–28.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff

faced a disciplinary hearing on January 15, 1998 where he was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well. [5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing. [6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at \*6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C.A. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

Footnotes

1    Because plaintiff's retaliation claims are dismissed on the merits, I find it unnecessary to address defendant's allegations that plaintiff failed to show physical injury to support his claim of emotional damages pursuant to 42 U.S.C. § 1997e(e) or that defendant is shielded from liability under the Eleventh Amendment.

2    When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

3    Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

4    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

5    As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

6    Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    4